UNITED STATES DISTRICT COURT:

SOUTHERN DISTRICT OF NEW YORK

# 19 CV 6206

_____X

SEAN FINCHER,

                Plaintiff,

-against-

THE CITY OF NEW YORK: NYPD

OFFICER LAUREN MORRIARITY (BADGE

NO. 961964); NYPD OFFICER JOSEPH

MESARIS (BADGE NO.961949); NYPD

OFFICER "JANE DOE#1" (The Name being

Fictitious as the True Name is Unknown);

NYPD OFFICER "JOHN DOE #1" (The

Name being Fictitious as the True Name

Is Unknown); NYPD "JOHN DOE"

SERGEANT (The Name being

Fictitious as the True Name is Unknown);

STEPHEN GUTTMAN (FDNY/EMT);

ANDREW ZUCKER (FDNY/EMT)

                Defendants.

_____X

**COMPLAINT AND**

**DEMAND FOR JURY TRIAL**

19 Civ._____ (   )(   )

## PRELIMINARY STATEMENT

1.     This is a civil rights action seeking compensatory and punitive damages from Defendants, the City of New York, NYPD Officer Lauren Morriaritas (badge #961964) ; NYPD Officer Joseph Mesaris (badge #961949); NYPD Officer "Jane Doe#1; NYPD Officer "John Doe#1); NYPD "John Doe Sergeant"; and FDNY/EMT workers: Stephen Guttman, and Andrew Zucker (collective "Defendants"), for Defendants' violations of Plaintiff's Sean Fincher's rights, guaranteed to him under both the constitutions of the United States (XIV Amendment), and state of New York (Art. I, §12) against illegal seizures without due process of law; the right to refuse medical treatment (bodily integrity); and, pursuant to 42 U.S.C. § 1983.

2.     On May 4, 2018, plaintiff, Sean Fincher, was at the relevant time, a 49 year old African American male. Plaintiff was a lawful resident in the County of Bronx, in the State of New York, and at all relevant times priorto, resided lawfully at 1218 Hoe Ave, Bronx, New York, 10459. Upon information and belief, the residence is a shelter owned by a non-profit organization called the South East Bronx Development Co. ("SEBCO"). Plaintiff was assigned to this shelter after spending 90 days on Wards Island.

3.      Over the course of 3 hours starting at approximately 10:25 p.m. on May 4, 2018; the defendant NYPD officers along with members of FDNY/EMT, falsely arrested, illegally transported, and detained Plaintiff, Sean Fincher, against his will to Lincoln Hospital. Plaintiff was not under lawful arrest, and has suffered severe physical injuries to his neck, shoulder and back areas, as well as severe psychological and emotional distress, due to the illegal actions of the collective defendants.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 3612, and 42 U.S.C. § 1983.

5.      The Court has subject jurisdiction over Plaintiff's tort law claims pursuant to 28 U.S.C. § 1367, because the federal local law claims arise from a common nucleus of operative fact.

6.      Venue is proper pursuant to the Supremacy Clasuse of Article VI of the United States Constitution, as a substantial portion of the events or omissions giving rise to the claims occurred herein, and C.P.L.R. § 503(a).

## PARTIES

7.     Plaintiff, Sean Fincher, is a citizen of the United States. He currently resides in New York County.

8.     Defendant City of New York is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. *Generally*, GML Art. I, § II; N.Y. General City Law, Art. II-A, §19. At all times relevant hereto, Defendant City of New York, acting through the New York City Police Department ("NYPD"), was responsible for the policy, practice, supervision, implementation and conduct of all NYPD matters and was responsible for the appointment, training, supervision and conduct of all NYPD personnel, including the Defendants referenced herein. In addition, at all relevant times, Defendant City of New York was responsible for enforcing the rules of the NYPD and for ensuring that NYPD personnel obey the laws of the United States and the State of New York. *See*, N.Y.C. Charter, Ch. 18, § 435

9.     At all times relevant hereto, Defendant NYPD Officer Lauren Morriarity was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such. NYPD Officer Lauren is being sued in both her official and individual capacities.

3

10.    At all times relevant hereto, Defendant NYPD Officer Joseph Mesaris was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of his employment as such. NYPD Officer Joseph Mesaris is being sued in both his official and individual capacities.

11.    At all times relevant hereto, Defendant NYPD Officer "Jane Doe#1" was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such. NYPD Officer "Jane Doe#1" is being sued in both her official and individual capacities.

12.    At all times relevant hereto, Defendant NYPD Officer "John Doe#1" was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of his employment as such. NYPD Officer "John Doe#1" is being sued in both his official and individual capacities.

13.    At all times relevant hereto, Defendant NYPD "John Doe" Sergeant, was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of his

employment as such. NYPD "John Doe" Sergeant is being sued in both his official and individual capacities.

14.   At all times relevant hereto, Defendant STEPHEN GUTTMAN, was an Emergency Medical Technician acting in the capacity of agent, servant and employee of Defendant City of New York for its fire department, and within the scope of his employment as such. STEPHEN GUTTMAN is being sued in both his official and individual capacities.

15.   At all times relevant hereto, Defendant ANDREW ZUCKER, was an Emergency Medical Technician acting in the capacity of agent, servant and employee of Defendant City of New York for its fire department, and within the scope of his employment as such. Defendant ANDREW ZUCKER is being sued in both his official and individual capacities.

## FACTUAL ALLEGATIONS

### I.   Defendant's Illegal Seizure of Plaintiff

16.   On May 4, 2018, at approximately 10:25 p.m., numerous NYPD officers, including Officers Morriarity, Mesaris, Jane Doe#1, John Doe#2, and NYPD "John Doe" Sergeant entered into Plaintiff's 3rd Floor dormitory (Rm.322) inside of 1218 Hoe Ave, in the County of the Bronx.

17.    As the Defendant officers entered the dormitory, Plaintiff was watching an NBA playoff game on his cell phone.[1] Plaintiff was calm as the officers entered. He was watching the game while standing, fully clothed, at his assigned locker. He was not engaging any other shelter resident in a belligerent, agitated or threatening manner; he was not yelling any profanities or racial epitaphs at anyone, nor did he direct any hostile or racial remarks to any of the approaching Defendant officers.

18.    Defendant Morriarity first addressed Plaintiff, by asking him "did he know of anything that happened earlier?" Plaintiff responded in sum and substance he "was not aware of anything happening earlier."

19.    Defendant Morriarity then asked Plaintiff in sum and substance, "where he'd been earlier?" Plaintiff in a calm and measured tone responded "I'm not at liberty to discuss [his] whereabouts with anyone."

20.    Defendant Morriarity then asked Plaintiff whether he had been "in any altercations earlier?" Plaintiff again, in a calm and measured tone responded "no."

21.    After several minutes elapsed, Defendant Morriarity, who was outside of Plaintiff's dormitory, was heard saying on a cell phone "well if he doesn't want to press charges there's nothing I can do." It is presumed that the "he" Defendant

---

[1] Houston Rockets v. Utah Jazz (Game 3)

Morriarity was referring to was another unidentified shelter resident, whom

according to two shelter staff employees, became involved in an earlier altercation

with Plaintiff. One of the two staff members informed the NYPD defendants that

Plaintiff was seen in one of the facility's surveillance cameras, striking the

unidentified resident. After approximately ten minutes passed, the FDNY/EMT

Defendants Zucker and Guttman entered into Plaintiff's dormitory. Defendant

Zuckerman then asked Plaintiff "what was going on?" Plaintiff responded in a

calm and measured tone "nothing that he knew of." Defendant Zucker further

asked Plaintiff whether "he had been drinking earlier?" Again Plaintiff, in a calm

and measured tone responded: "I'm not at liberty to discuss my whereabouts."

22.    Defendant Zucker then warned Plaintiff "…Listen, there's two ways

we can do this, the easy way is to [voluntarily] walk downstairs to the ambulance;

the second way, if you refuse, is to be taken out in handcuffs."

23.    Plaintiff then inquired of Defendant Morriarity was he "being

arrested," to which the officer responded "no." Plaintiff then asked Defendant

Zuckerman "why should he go to the ambulance when he wasn't injured or under

arrest?" Defendant Zuckerman then responded that Plaintiff was being taken to the

hospital "to get checked out by the doctor, and if he says you're ok, you can come

back."

24.   Neither of the shelter staff workers informed the NYPD and EMT

Defendants that Plaintiff posed an imminent threat to other shelter residents, staff

or himself, or that he needed medical clearance from a medical professional

attesting to such.

25.   Notably, at no time during Plaintiff's encounter with the Defendants

was he ordered to sit down, stay still, be handcuffed, nor did the NYPD defendants

not allow Plaintiff access to a black back-pack that he was constantly looking into,

while they were inside of the dormitory.

26.   It was at this point that Defendant Morriarity asked Plaintiff "are you

going to go voluntarily to the ambulance?" Plaintiff again in a measured tone,

asked whether he was "being arrested." The Defendants collectively responded:

"no." Plaintiff then asked the NYPD Defendants why if he "wasn't arrest, he was

being forced to go the hospital?" The Defendants then replied that "once you're

seen by a doctor and given an ok, you can return." Plaintiff then expressed

skepticism towards the Defendant's averments, and then informed them that he

"knew his rights," and "could not be taken to a hospital against his will."

27.   At this point, Defendant NYPD "John Doe" Sergeant had arrived 8-10

minutes later inside of Plaintiff's dormitory, ordered the NYPD Defendants to

"cuff him." Plaintiff, who at this time, was seated at the edge of his assigned bed

with his hands clasped together, was then grabbed and forcefully thrown to the floor by the NYPD Defendants. With their knees in Plaintiff's back, neck, and shoulder areas, they then placed his hands behind his back and proceeded to rear-cuff him. Plaintiff was then escorted out of the shelter in handcuffs to a marked FDNY/EMT vehicle.

## II. Defendants FDNY/EMT and NYPD Defendant Mesaris' Transport of Plaintiff to Hospital

28.     Plaintiff was transported to Lincoln Hospital by Defendants Zucker, Guttman, and NYPD Officer Joseph Mesaris. Plaintiff was handcuffed during the entire ride there. During the ride, Plaintiff repeatedly asked Defendant Mesaris whether he was "under arrest?" Defendant Mesaris then replied: that he "wasn't." Plaintiff repeatedly asked Defendant Mesaris was he "free to leave?" Defendant Mesaris would then respond: "no."

29.     Plaintiff, still handcuffed, arrived at Lincoln Hospital ("Lincoln") at approximately between 11:50-11:55 p.m., where he was escorted into the hospital's "Emergency Room." Plaintiff asked to use the restroom, and Defendant Mesaris allowed plaintiff to use it, with one handcuff still on his wrists. When Plaintiff finished, he was re-cuffed by Defendant Mesaris.

30.     While waiting in the hospital's Emergency Room, Plaintiff repeatedly asked both Defendants Mesaris and Morriarity was he under arrest. When they

9

responded "no," Plaintiff would then ask "am I free to leave," to which they responded "no." After spending 45 minutes in the Emergency Room, Plaintiff requested access to his cell phone, in order to call family members and let them know his whereabouts. However, Defendants Mesaris and Morriarity replied "no" and refused to un-cuff him in order to use his cellular phone, which was inside of his cargo pants. Plaintiff was allowed to take his back-pack with him to the hospital.

31.     After approximately 1 hour, Plaintiff was seen by the hospital's triage nurses. When the triage nurse attempted to take Plaintiff's vital signs, he refused any treatment by the triage nurse.

32.     The triage nurse asked Plaintiff: "you don't want to be treated?" Plaintiff responded "no."

33.     Plaintiff still handcuffed and against his will, was made to wait another hour before he was seen by an M.D. The M.D. asked Plaintiff questions about the time, date, and his name, which Plaintiff answered to the doctor's satisfaction. The doctor then asked the NYPD defendants: "why is he here?" Defendant Morriarity then explained to the doctor in sum and substance; that "shelter staff said he was acting in a belligerent manner at the shelter and that he needed to be checked out." The doctor then responded: "well I can't treat him if he

doesn't want to be treated." It was at this point at approximately 1:40 a.m. on May 5, 2018, Defendant Morriarity then un-cuffed Plaintiff. Plaintiff then proceeded to leave the hospital. Shortly after his departure from Lincoln Hospital, Plaintiff telephoned the shelter and spoke to the same staff member who had spoken to the Defendants earlier in the evening. The shelter staff member informed Plaintiff that he had retained his bed, and that his belongings were still at the shelter. No further incidents occurred between Plaintiff and shelter staff or residents upon his return to the shelter.

34.    Earlier in the evening, prior to the NYPD's arrival to the shelter, Plaintiff went into 1214 Hoe Ave, in order to sign the facility's nightly bed roster. The subject address is comprised of three buildings: 1214; 1216; and 1218 Hoe Ave. Plaintiff, at the relevant time, resided in 1218 Hoe Ave. When Plaintiff entered into Bldg. 1214, he was required to pass through a magnometer while he was also carrying a backpack. Plaintiff objected to passing through the metal detector while carrying the bag to the security guard stationed there, and stated in sum and substance to the guard that now all of a sudden, he wanted to follow standard procedures and that at any other time, this particular guard would not ordinarily follow these procedures. Plaintiff then left the bag on the other side of the magnometer while he walked through, and without making any contact with the security guard, continued to the Operations Window in order to sign for his bed.

## NOTICE OF CLAIM

35.    Within ninety days after the claim arose, Plaintiff filed Notice of Claim upon Defendant City of New York by delivering copies of the notice by certified mail to the New York City Comptroller's Office.

36.    The Notice of Claim was in writing, sworn to by Plaintiff and contained his name and address.

37.    The Notice of Claim set out the nature of the claim; the time when and the place where and manner by which the claim arose, and the damages and injuries claimed to have been sustained by Plaintiff.

38.    The City of New York has neglected and failed to adjust the claims within the statutory time period.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### (Defendant NYPD Officers Illegal Seizure and Defendant FDNY/EMT'S Illegal Transport of Plaintiff to Lincoln Hospital, Violated Plaintiff's U.S. Constitutional Fourth Amendment Right and New York State Right against Illegal Seizure, Constituted False Imprisonment)

39.    Plaintiff, Sean Fincher, restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

40.    The Fourth Amendment of the United States Constitution, which limits the powers of the states by way of the Fourteenth Amendment, provides that

"...[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath, or affirmation, and particularly describing the place to be searched, and the person or things to be seized..." U.S.C.A. XIV Amendment

41.    The ultimate goal of this provision is to protect people's right to privacy and freedom from unreasonable intrusions by the government.

42.    New York's Mental Health Law § 9.41, in its most relevant portion prescribes that law enforcement: "...May take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40, or, pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place..." M.H.L. § 9.41

43.    Section 9.01 of the M.H.L. proscribes that removal should occur when there is a "... Likelihood of serious harm be manifested, by threats of or attempts at "suicide" or "homicidal or other violent behavior..." M.H.L. § 9.01

## I. **The New York State Department of Health's EMT Statewide Protocol for Handling "Behavioral" Emergencies**

44.    The New York State Department of Health's "EMT Statewide Protocol," which the FDNY/EMT defendants are bound by, in its "Behavioral Emergency" subsection indicates that EMS workers should: "…Restrain, *only if necessary*, using soft restraints to protect the patient and others from harm. *Restraints should only be used if the patient presents a danger to themselves or others.*[2] *Id.* at M-4 (emphasis added)

45.    According to the New York City Fire Department's "Prehospital Care Report Summary" ("ACR Report"), which Plaintiff obtained on May 21, 2018, the FDNY/EMT defendants: Zucker and Guttman falsely documented that "as per facility supervisor and security 'he came in, had been drinking, ran past security pushing them out of the way and ran upstairs.'" Plaintiff was not drinking inside or outside of the shelter. The FDNY/EMS defendants then go on to falsely record that: "…facility[s] supervisor explained to PT that he could not stay in facility tonight and needed to be evaluated. PT refused to leave. NYPD 42 PCT placed PT in hard restraints and PT removed to ambulance…" However, documentation obtained by Plaintiff prior to the filing of this complaint disputes the FDNY Defendants' averments.

---

[2] New York State Dept. of Health (Bureau of Emergency Services) Statewide Basic Life Support Adult & Pediatric Treatment Protocols, EMT-B and AEMT (Updated November 20, 2008)

## II. **New York City Police Department's Patrol Guide – Procedure#221-13**

46.    The NYPD's Patrol Guide – Procedure #221-13 entitled: "Mentally Ill or Emotionally Disturbed Persons" ("Directive No.221-13") outlines the protocols NYPD officers should follow when they encounter persons whom pose a danger to the public and/or themselves.

47.    Directive No.221-13 describes emotionally disturbed persons ("EDPs") as: "… A person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which the police officer reasonably believes likely to result in serious injury to himself or others." Plaintiff is not conceding mental illness. *Id* at pg.1

48.    On May 4, 2018 NYPD defendants Officer Lauren Morriarity, NYPD Officer Joseph Mesaris, NYPD Officer "Jane Doe #1", NYPD Officer "John Doe #2", and NYPD "John Doe" Sergeant, without a warrant or probable cause, illegally seized plaintiff, who was a lawful resident of the Father Smith shelter, inside of 1218 Hoe Ave in Bronx County at the relevant time, and transported him against his will, in handcuffs, to Lincoln Hospital.

49.    Upon the Defendants NYPD arrival inside of the shelter, Plaintiff did not: threaten anyone, was not acting in an agitated state, possess a weapon, nor did he pose a danger to himself, shelter staff, or other shelter residents. Plaintiff was

simply leaning on a locker, watching a basketball game on his cell phone with his headphones on. Plaintiff's demeanor and actions on May 4, 2018, did not come anywhere close to the thresholds needed to establish probable cause under New York's Mental Health Law, or contained in either of the defendant City of New York's agencies directives.

50.    As Plaintiff pointed out above, no shelter staff member informed him that he was being ejected from the shelter; moreover, after Plaintiff was released from the NYPD defendants' custody at Lincoln Hospital, he spoke to the shelter worker, who is nothing more than an Operations Manager, and was informed by the worker that he retained his bed at the shelter. Furthermore, an operations manager inside of a shelter, is not an individual qualified under New York's Social Services Laws to make a determination as to whether an individual is deemed mentally fit to return to a shelter, which the collective Defendants knew or should have known.

51.    The collective defendants' illegal seizure and transport of Plaintiff against his will to Lincoln Hospital constituted a false imprisonment in that:

(i)     the NYPD intended to confine Plaintiff;

(ii)    Plaintiff was conscious of the confinement;

(iii)   Plaintiff did not consent to the confinement; and

(iv)    No probable cause existed at the time of Plaintiff's illegal seizure, thus his confinement was not privileged.

52.    Moreover, the EMT Defendants Steven Guttman and Andrew Zucker were complicit in the violation of Plaintiff's rights by transporting him to the hospital via ambulance, and were well aware that Plaintiff did not consent to his transport.

53.    By their conduct above, the individual NYPD Defendants Officer Lauren Morriarity, NYPD Officer Joseph Mesaris, NYPD Officer "Jane Doe #1", NYPD Officer "John Doe #1", NYPD "John Doe" Sergeant, and FDNY/EMS Defendants Andrew Zuckerman and Stephen Guttman, all of whom were acting under color of law; deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983, including but not limited to, rights guaranteed under the Fourth and Fourteenth Amendments of the U.S. Constitution. The Individual Defendants' conduct manifested a deliberate indifference to Plaintiff's federal and constitutional rights.

54.    Accordingly, Plaintiff was harmed as a direct result of the Individual Defendant's unlawful, unconstitutional, and discriminatory conduct and is entitled to damages and relief in an amount to be determined by the Court.

## SECOND CLAIM FOR RELIEF

Violation of Civil Rights

(Title 42 U.S.C. § 1983)

### (Municipal Liability Against Defendant, City of New York's Failure to Supervise NYPD Defendants)

55.     Plaintiff, Sean Fincher, restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

56.     42 U.S.C. § 1983 provides a remedy for individuals whose constitutional rights have been violated under color of law. The statutes relevant portion guarantees that: "…Every person who under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress…" 42 U.S.C. § 1983

57.     Defendant City of New York, the Individual NYPD and FDNY/EMT defendants, are "persons" within the meaning of 42 U.S.C. § 1983.

58.     Plaintiff's unconstitutional seizure, and transport to Lincoln Hospital by the collective defendants, constituted a false arrest, and was pursuant to a

"policy of inaction" by Defendant City of New York, as is defined under 42 U.S.C. § 1983.

59.    Members of the NYPD, engage in a policy and practice of unlawfully seizing and arresting individuals whose actions do not constitute grounds for probable cause of criminal activity, said persons are detained on and off of police precincts routinely in New York City.

60.    Members of the NYPD also engage in a policy and practice of repeatedly using excessive force against members of the public. Such excessive force includes pushing, shoving, grabbing, punching, and striking people. In many instances this force is not used pursuant to a lawful arrest, and is mostly utilized for unjustified reasons. These physical altercations often cause injuries that, in many cases, require medical care, and in some instances, death.

61.    For example, over a 10-year period, the NYPD has been involved in numerous high-profile incidents that has put defendant City of New York on notice, that the need for effective supervision of NYPD personnel was obvious. Among some of these incidents:

- In March of 2016, Otis Reese, a 30-year old Bronx man returning from a deli, was accosted by NYPD officers, who falsely accused him

of carrying an open container of beer;[3] when in fact, one of the
officers is seen on the store's surveillance cameras opening the beer;

- In February of 2010, an African-American restaurant owner and
  retired doctor, Clyde Pemberton, was falsely arrested after breaking
  up an altercation between three Caucasian women in a Harlem
  restaurant. The criminal complaint filed against Mr. Pemberton falsely
  alleged that he tried to prevent the women from leaving the
  restaurant;[4]

- In December of 2015, an NYPD officer was convicted of fabricating
  the circumstances of the arrest of a N.Y. Times reporter in 2012. The
  officer, Michael Ackermann, alleged that a flash from the reporter's
  camera blinded him during a protest. It was later discovered that the
  reporter's camera wasn't capable of producing flashes;[5]

- In September of 2018, a 19-year old delivery worker was violently
  apprehended by three NYPD officers in Brooklyn, while waiting to
  pick up a grocery order for his boss. Among the charges the officers
  filed against the deliveryman that was contradicted by video evidence:

---

[3] http://www.nbcnewyork.com/news/local/Bronx-Man-Sues-NYC-1-Million-False-Arrest-Open-Bottle-Deli-NYPD-49448224.html

[4] http://www.nytimes.com/2018/09/03/nyregion/harlem-restaurant-owner-employees-sue-city-for-wrongful-arrest.html

[5] http://www.nydailynews.com/new-york/judge-rips-ex-cop-lying-arrest-nyt-staffer-article-1.2453383

reckless driving, and the claims that they did not use force to subdue him;[6]

- In August of 2016, an Upper East Side army veteran, while walking his dog was stopped and taunted by officers. One of the officers is alleged to have said to him "look, the reality is if you're a white guy on the Upper East Side, you wouldn't have been stopped."[7];

- On June 2, 2013, 3 Brooklyn men were stopped by NYPD officers, who accused one of them of urinating in public. The trio then alleged that they were subjected to homophobic slurs after asking for the officers' badge numbers and then beaten;[8]

- An NYPD-school crossing guard was arrested on November 16, 2017 for filing a false report against a Staten Island chiropractor;[9]

- A Brooklyn man was awarded Three-Million dollars after NYPD officers beat the man in front of his son in April of 2014;[10]

---

[6] Gothamist.com/2019/03/19/surveillance_video_appears_to_under.php

[7] Brooklyn.news12.com/story/34774139/arny-vet-claims-nypd-officers-falsely-arrested-him

[8] https://www.gaycitynews.nyc/stories/2013/12w6900-gay-men-claim-police-violence-anti-gay-false-arrest-in-brooklyn-2013-06-11.html

[9] https://www.silive.com/news/2018/08/nypd_crossing_guard_admits_to.html

[10] https://www.dailynews.com/new-york/nyc-crime/ny-metro-beatdown-jury-verdict--against-NYPD-20180604-story.html

- An off-duty police officer was handcuffed, beaten with batons, and pepper sprayed in Queens in 2010, the officer subsequently suffered a broken hand;[11]

- In probably the most high-profile incident involving a false arrest by the NYPD, former tennis player, James Blake, was tackled by an NYPD officer outside of Grand Central Station, after being mistaken for another suspect in a credit-card scam ring on September 9, 2015[12]

- In April of 2015 an NYPD officer was cited for illegally detaining and frisking an African-American man in Staten Island;[13]

- On March 27, 2013 a 21 year-old, self-described activist from Brooklyn, was arrested by the NYPD after advocating that a "bounty" be placed on NYPD officers online, after the cop-related shooting of 16 year-old Kamani Gray in the same borough;[14]

- In March of 2016, after telling the driver of an unmarked police car to "slow down," an on-duty postal worker was handcuffed and arrested

---

[11] https://www.dnainfo.com/new-york/20160204/st-albans/off-duty-nypd-officer-beaten-by-police-his-home-awarded-15m-by-city/

[12] https://nypost.com/2018/08/01/tennis-star-james-blake-slams-de-blasio-nypd-over-false-arrest/

[13] https://wsj.com/articles/SB10001424052970204479504576637463643538104

[14] https://dailynews.com/new-york/nyc-crime/man-sues-nypd-false-arrest-bounty-case-article-1.1868429

by NYPD officers. Then NYPD Commissioner, Bill Bratton
commented after seeing the video that he "didn't like what he saw."[15]

- In February of 2018, four NYPD officers were tried in federal court,
  for allegedly falsifying arrests in order to obtain overtime. The trial
  stemmed from the false arrest of a man on trumped up felony drug
  possession charges;[16]

- In October 2016, a 16 year-old Staten Island teen returning from a
  grocery store, was arrested and falsely charged with a mugging by the
  NYPD;[17]

- In March of 2017, two NYPD detectives, Kevin Desormeau and Sasha
  Neve were indicted by a Queens grand jury after falsely accusing a
  Queens man of selling drugs in August of 2014. The two detectives
  were also facing similar charges in Manhattan, for making false
  statements in a gun arrest in Washington Heights;[18]

- In 2015, three members of the Illuminator Art Collective, filed a
  lawsuit against the NYPD for false arrest and seizure of their property

---

[15] Archive.massappeal.com/postal-worker-will-sue-nyc-over-false-arrest-by-nypd/

[16] https://www.dailykos.com/stories/2018/2/21/1743413/-NYPD-officers-on-trial-for-arresting-someone-just-to-rack-up-overtime-pay?

[17] https://www.theguardian.com/us-news/2018-may-04/malik-thomas-nypd-staten-island-advance-false-arrest

[18] https://www.newsday.com/news/new-york/da-2-nypd-detectives-from-long-island-indicted-in-fake-arrest-1.13221943

at a protest held outside the Metropolitan Museum of Art on
September 9, 2014;[19]

- In 2014, a Cardozo Law School student was arrested by two NYPD
  officers after he questioned them about illegally parking at a bus stop
  while they were picking up food from a food truck. The charges,
  disorderly conduct, were later dropped.

62.     According to statistics released by the New York City Corporation
Counsel's Office, defendant City of New York has spent over 380 million dollars
to settle cases of police misconduct, initiated between 2013-2018.[20] Included in
those suits, were allegations of excessive force and false arrests. Over this same
five-year period there were at least 190 lawsuits filed in both New York state and
federal courts that alleged excessive force, and false arrests by the NYPD.

63.     It was highly predictable that NYPD personnel would and will
continue to encounter people in New York City streets, shelters, schools, subway
stations, and residences. Furthermore, Defendant City of New York knew that
NYPD personnel had a history of using excessive force and falsely arresting its
residents.

---

[19] https://hyperallergic.com/209080/members-of-the-illuminator-sue-nypd-for-false-arrest-first-amendment-retaliation/

[20] https://www.nypost.com/2018/09/04/nyc-has-shelled-out-384m-in-five-years-to-settle-nypd-suits/

64.   In fact, Defendant City of New York had constructive notice through court filings, its own internal NYPD disciplinary proceedings, and newspaper reports that NYPD personnel were routinely using excessive force and were making unlawful arrests, and that the need for effective and appropriate supervision was so obvious, that the failure to do so, would result in the deprivation of New York City residents' rights.

65.   Moreover, Defendant City of New York's failure to investigate instances of excessive force and false arrests, constitutes a "policy" of inaction, as is defined under 42 U.S.C. § 1983, and was the moving force behind the actions of NYPD defendants Officer Lauren Morriarity, NYPD Officer Joseph Mesaris, NYPD Officer "Jane Doe #1", NYPD Officer "John Doe #1", and NYPD "John Doe" Sergeant against Plaintiff on May 4, 2018.

66.   By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiff was subjected to the conduct alleged herein, Defendant City of New York, and through it the NYPD, has deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

67. Accordingly, Plaintiff was harmed as a direct result of Defendants unlawful, and unconstitutional conduct, and is entitled to damages, fees and costs in an amount to be determined by the Court.

## **THIRD CLAIM FOR RELIEF**

(Defendant City of New York's Failure to Train the NYPD on Properly Identifying an Emotionally Disturbed Person)

68. Plaintiff, Sean Fincher, restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

69. The Individual Defendants were, at all times hereto, officers of the New York City Police Department, and the New York City Fire Department. Furthermore, all of the Individual Defendants' conduct throughout, Plaintiff's illegal detention, and transport to Lincoln Hospital was performed under the color of New York state law.

70. As was pointed out above, Directive #221-13 describes an EDP as: "… A person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which the police officer reasonably believes likely to result in serious injury to himself or others."

71. The agency responsible for NYPD oversight, the New York City Department of Investigation's Office of the Inspector General issued a report in 2017, entitled "Putting Training Into Practice: A Review of NYPD's Approach to

Handling Interactions with People in Mental Crisis" ("OIG Report") which

highlighted several deficiencies in the NYPD's response to mental crisis situations.

72.     Among the deficiencies highlighted by the OIG's Report:

- The NYPD's failure to properly deploy officers who have taken Crisis

  Intervention Training ("CIT") to CIT incidents (OIG Report at pgs.

  12-14);

- The existing Patrol Guide "emphasizes containment and putting the

  individual into custody" (*Id.* at pg. 17)

- The NYPD's current policies "…do not provide officers with

  guidance as to what alternative outcomes or services are available or

  appropriate for non-violent people in mental crisis." (*Id.* at pg. 20)

- Citing the Patrolman Guides' "Additional Data" section, NYPD

  personnel are instructed to: "…Refer persons who voluntarily seek

  psychiatric treatment to proper facility," the directive "does not give

  any context or guidelines for making such a decision." (*Id* at pg. 21)

  Furthermore, the Directive is silent as to what procedure an officer is

  to follow when an individual is not violent and refuses to go to a

  hospital.

73.     The City of New York has failed to implement appropriate training, practices, policies, and procedures that effectively identify people as EDPs'.

74.     It was highly predictable that NYPD personnel would encounter people with purported "behavioral problems." Consequently, Defendant City of New York knew to a moral certainty that NYPD personnel would encounter individuals with purported "behavioral problems."

75.     It continues to be highly predictable that NYPD personnel will encounter persons who both would, and would not, pose a risk of harm to themselves or others. Consequently, Defendant City of New York knew to a moral certainty that NYPD personnel would encounter individuals who both do, and do not, pose a risk to themselves or others.

76.     Furthermore, Defendant City of New York knows that the NYPD's policies and methods for identifying potential EDPs' are insufficient because there is a history of NYPD officers having difficulty mishandling, and identifying potential EDPs'. Defendant City of New York has long been aware that the NYPD's failures would result, and will continue to result, in the deprivation of New York City's residents' constitutional and federal rights.

77. Defendant City of New York's deliberate choice to ignore the known problems with NYPD officers identifying potential EDPs, and the City of New York's failure to implement an adequate policy or practice to guide NYPD officers concerning how to identify EDPs, resulted in the violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments of the United States Constitution.

78. The City of New York also failed to adequately train, monitor and supervise its employees regarding their constitutional and federal duty, despite the NYPD's history of encounters with people both with and without, "behavioral problems."

79. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiff was subjected to the conduct alleged herein, Defendant City of New York has deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, and the State of New York's Constitution, to wit: Art. I, Section 12.

80.     Accordingly, Plaintiff, Sean Fincher was harmed as a direct result of

Defendants' unlawful, unconstitutional, and discriminatory conduct, and is entitled

to damages, and costs in an amount to be determined by the Court.

## FOURTH CLAIM FOR RELIEF

(Defendant NYPD "John Doe Sergeant's" Failure to Intervene in Plaintiff's Illegal
Seizure, Transport, and Detention, Resulted in the Violation of his Fourth
Amendment Right Against Illegal Seizure)

81.     Plaintiff, Sean Fincher, restates and incorporates by reference the

preceding paragraphs above as if set forth fully herein.

82.     While Plaintiff was inside of the Father Smith Residence along with

the NYPD and FDNY/EMT Defendants on May 4, 2018, he did not appear to be

mentally ill, nor was he manifesting conducting demonstrating that he was

dangerous to himself, the NYPD and FDNY/EMT defendants, or other shelter

residents and staff.

83.     Defendant NYPD "John Doe" Sergeant was present inside of 1218

Hoe Ave, while his subordinate officers, Defendants NYPD Officer "X" Morriarity,

NYPD Officer "X" Mesaris, NYPD Officer "Jane Doe #1", NYPD Officer "John

Doe #1" were also present. Defendant NYPD "John Doe Sergeant" gave the

NYPD Defendants the order to place Plaintiff in hard restraints. No probable cause

existed for Plaintiff's illegal seizure.

84.    Defendant NYPD "John Doe Sergeant" (1) observed, or had reason to know of, the NYPD Defendants illegal seizure of Plaintiff's person, and (2) had a realistic opportunity to intervene to prevent the illegal seizure and detainment from taking place. Defendant NYPD "John Doe" Sergeant's" failure to intervene is pursuant to a policy ratified by policymakers in both the NYPD and the City of New York.

85.    By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiff was subjected to the conduct alleged herein, Defendant City of New York, and through it the NYPD, has deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

86.    Accordingly, Plaintiff was harmed as a direct result of Defendants unlawful, and unconstitutional conduct, and is entitled to damages, fees and costs in an amount to be determined by the Court.

## FIFTH CLAIM FOR RELIEF

(NYPD Defendants Failure to Allow Plaintiff the Use of His Cell Phone Violated
his First Amendment Right to Familial Association)

87.     Plaintiff, Sean Fincher, restates and incorporates by reference the

preceding paragraphs above as if set forth fully herein.

88.     On May 4, 2018, during the course of the NYPD Defendants illegal

seizure, detention, and transport of Plaintiff to Lincoln Hospital, Plaintiff was in

possession of his cell phone, which was inside of the cargo shorts he was wearing.

89.     While Plaintiff was inside of Lincoln Hospital's Emergency Room, he

asked NYPD Defendant Messaris if he could use his cell phone to make his

whereabouts known to his family. At that time, no reasonable time place and

manner restrictions existed in order for Plaintiff's right to contact his family

members; however, Defendant Messaris said "no."

90.     The NYPD Defendants denial of Plaintiff's request to use his cell

phone, violated his First Amendment right to familial association under both the

United States and New York Constitutions.

91.     Accordingly, Plaintiff was harmed as a direct result of Defendants

unlawful, and unconstitutional conduct, and is entitled to damages, fees and costs

in an amount to be determined by the Court.

92.     Accordingly, Plaintiff was harmed as a direct result of Defendants unlawful, and unconstitutional conduct, and is entitled to damages, fees and costs in an amount to be determined by the Court.

### SIXTH CLAIM FOR RELIEF

(New York State Claims for Intentional Infliction of Emotional Distress – Against All Defendants)

93.     Plaintiff, Sean Fincher, restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

94.     NYPD defendants Officer Lauren Morriarity, NYPD Officer Joseph Mesaris, NYPD Officer "Jane Doe #1", NYPD Officer "John Doe #1", NYPD "John Doe" Sergeant, FDNY/EMT Defendants Andrew Zuckerman and Stephen Guttman, knowing that no probable cause existed and forcefully transporting Plaintiff to Lincoln Hospital, solely for their own gratification, intentionally and maliciously, inflicted emotional trauma upon Plaintiff.

95.     As a result of all of the Individual Defendant's actions, Plaintiff now suffers from anxiety, fear, shaking, severe emotional trauma, and tightness in his chest.

## SEVENTH CLAIM FOR RELIEF

### (Defendant NYPD'S Excessive Use of Force on Plaintiff Resulted in His Physical Injuries)

96.     Plaintiff, Sean Fincher, restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

97.     NYPD defendants Officer Lauren Morriarity, NYPD Officer Joseph Mesaris, NYPD Officer "Jane Doe #1", NYPD Officer "John Doe #1", NYPD "John Doe" Sergeant forcefully seized Plaintiff off of the bed he was sitting on, and placed their knees in his back, neck, and shoulder areas, resulting in severe pain to his neck and shoulder areas.

98.     As a direct and proximate result of the NYPD Defendants' excessive use of force, Plaintiff now has severe pain as well as loss of motion in his back, neck, and shoulder regions, for which he will need physical therapy for an indefinite period of time.

## **GENERAL DAMAGES**

99.     Plaintiff seeks compensation from the municipal defendants for being illegally detained, loss of time, humiliated, physical pain and suffering, emotional distress and loss of time on May 4, 2018 by the NYPD/EMT defendants in the amount of One-Million dollars ($1,000,000,000).

## **SPECIAL DAMAGES**

100.   Plaintiff seeks special damages from the municipal defendants due to their infliction of physical discomfort, pain, shock, and fear on Plaintiff, by the NYPD/EMT defendants in the amount of Five-Hundred-Thousand dollars ($500,000.00).

## **PRAYER FOR RELIEF**

**WHEREFORE:** Plaintiff respectfully prays that this Court grant the following relief against all of the Individual NYPD and FDNY/EMS Defendants:

1.     Assume jurisdiction over this matter;

2.     Award such damages to Plaintiff Sean Fincher, as will fully compensate him for the loss of his rights, as well as for the harm and indignity that he experienced due to Defendants unconstitutional conduct;

3.     Declare that the policy and practice of the NYPD's use of excessive force violated Plaintiff's federal and state rights;

4.     Compensatory damages in the amount of $1,000,000.00 (One-Million Dollars)

5.     Special damages in the amount of $500,000.00 (Five-hundred thousand dollars)

35

5.     Special damages in the amount of $500,000.00 (Five-hundred thousand dollars)

    6.     A total judgement in the amount of $1.500,000.00

    7.     This Court, allow Plaintiff to amend the complaint in order to ascertain the identities of the NYPD Defendants: NYPD Officer "Jane Doe #1", NYPD Officer "John Doe #1", and NYPD "John Doe" Sergeant pursuant to C.P.L.R. §§ 1024 and 3025(b);

    8.     Award Plaintiff reasonable fees, costs, and expenses incurred in prosecuting this action; and whatever other relief the Court deems equitable and proper.

Dated: July 1, 2019

SEAN FINCHER – Plaintiff

153-70 S. Conduit Ave – Rm.208

Jamaica, N.Y. 11434