UNITED STATES DISTRICT COURT:
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

SEAN FINCHER,

                       Plaintiff,

    -against-

THE CITY OF NEW YORK; NYPD OFFICER LAUREN MORIARTY (Shield No.14377) (In Her Individual and Official Capacities); NYPD OFFICER JOSEPH MESARIS (Shield No. 16202) (In His Individual and Official Capacities); NYPD SERGEANT MICHAEL URENA (Shield No. 1095) (In His Individual and Official Capacities); NYPD OFFICER STEPHANIE ALBA (Shield No. 19604) (In Her Individual and Official Capacities); FDNY/EMT STEPHEN GUTTMAN (Shield No. 5287) (In His Individual and Official Capacities); FDNY/EMT ANDREW ZUCKER (Shield No. 1463) (In His Individual and Official Capacities),

                       Defendants.

---------------------------------------------------------------X

**SECOND AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

19 Civ. 6206 (LGS)

## PRELIMINARY STATEMENT

1. This is a civil rights action seeking compensatory and punitive damages from Defendants, The City of New York, NYPD Officer Lauren Moriarty (Shield No. 14377), NYPD Officer Joseph Mesaris (Shield No. 16202), NYPD Sergeant Michael Urena (Shield No. 1095), NYPD Officer Stephanie Alba (Shield No. 19604), FDNY/EMT Officers Stephen Guttman (Shield No. 5287) and Andrew Zucker (Shield No. 1463) (collectively "the Defendants"); in both their individual and official capacities, for defendants' violations of Plaintiff Sean Fincher's ("Plaintiff") rights, guaranteed to him under both the constitutions of the United States (IV and XIV Amendments), and state of New York (Art. I, §12), against illegal seizures without due process of law; the right to refuse medical treatment (bodily integrity), pursuant to *Cruzan v. Director for Missouri Dept. of Health*, 497 U.S. 261 (1990); and, pursuant to 42 U.S.C. §1983.

2. On May 4, 2018, plaintiff Sean Fincher, was at the relevant time, a 49 year-old African American male. Plaintiff was a lawful resident in the County of Bronx, in the State of New York, and at all relevant times priorto, resided lawfully at 1218 Hoe Ave., Bronx, New York. Upon information and belief, the residence is a shelter owned by a non-profit organization called the South East Bronx Development Co.

3. Over the course of 3 hours starting at approximately 10:25 p.m. on May 4, 2018; defendant NYPD officers in conjunction with agents of FDNY/EMT, forcibly seized, falsely arrested, illegally transported, and detained plaintiff against his will to Lincoln Hospital ("Lincoln"), which is located on East 149th Street in the borough of the Bronx. Plaintiff was not under lawful arrest, and has suffered severe physical injuries to his back, shoulder and neck areas as well as severe psychological and emotional distress, due to the illegal actions of the collective defendants.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. §1983, the Fourth and Fourteenth Amendments of the United States Constitution, and New York Constitution's Art. I, §12, which prohibits the unlawful seizure and detention without due process of law. 28 U.S.C. §§1331, 1343(a)(3) and (4), and 1367(a).

5. The Court has subject jurisdiction over Plaintiff's tort law claims pursuant to 28 U.S.C. §1367, because the federal local law claims arise from a common nucleus of operative fact.

6. Venue is proper, as a substantial portion of the events or omissions giving rise to the claims occurred in the Southern District of New York. 28 U.S.C. §1391(b)

## PARTIES

7. Plaintiff, Sean Fincher, is a citizen of the United States. He currently resides in Jamaica, New York.

8. Defendant The City of New York is a municipal corporation duly organized and existing and by virtue of the laws of the State of New York. *Generally*, GML Art. I, § II; N.Y. General City Law, Art. II-A, §19. At all times relevant hereto, Defendant City of New York, acting through the New York City Police Department ("NYPD"), was responsible for the policy, practice, supervision, implementation and conduct of all NYPD matters and was responsible for the appointment, training, supervision and conduct of all NYPD personnel, including Defendants referenced herein. In addition, at all relevant times, Defendant City of New York was responsible for enforcing the rules of the NYPD and for ensuring that NYPD personnel obey the laws of the United States and the State of New York. *See*, N.Y.C. Charter, Ch. 18, §435.

9. At all times relevant hereto, defendant NYPD Officer Lauren Moriarty, was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such. NYPD Officer Lauren Moriarty is being sued in both her official and individual capacities.

10. At all times relevant hereto, defendant NYPD Officer Joseph Mesaris, was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of his employment as such. NYPD Officer Joseph Mesaris is being sued in both his official and individual capacities.

11. At all times relevant hereto, defendant NYPD Sergeant Michael Urena, was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such. NYPD Sergeant Michael Urena is being sued in both his official and individual capacities.

12. At all times relevant hereto, defendant NYPD Officer At all times relevant hereto, defendant NYPD Officer Stephanie Alba was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such. NYPD Officer Stephanie Alba is being sued in both her official and individual capacities.

13. At all times relevant hereto, defendant Stephen Guttman, was an Emergency Medical Technician in the FDNY acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such. EMT Stephen Guttman is being sued in both his official and individual capacities.

3

14.     At all times relevant hereto, defendant Andrew Zucker, was an Emergency Medical Technician in the FDNY acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of her employment as such. EMT Andrew Zucker is being sued in both his official and individual capacities.

## FACTUAL ALLEGATIONS

### I.      Defendant's Illegal Seizure of Plaintiff

15.     On May 4, 2018 at approximately 10:25 p.m., numerous NYPD officers, defendants Moriarty, Mesaris, Urena, Alba, entered into plaintiff's 3rd Floor dormitory (Rm. 322) inside of 1218 Hoe Ave. which is in County of Bronx, located in the State of New York.

16.     As the defendant NYPD officers entered the dormitory, plaintiff was watching an NBA playoff game on his cell phone.[1]

17.     Defendant Moriarty first addressed plaintiff by asking him "do you know of anything that happened earlier?" Plaintiff responded in sum and substance he "was not aware of anything happening earlier."

18.     Defendant Moriarty then asked plaintiff in sum and substance "where he'd been earlier?" Plaintiff in a calm and measured ton responded "I'm not at liberty to discuss [his] whereabouts with anyone."

19.     Defendant Moriarty then asked plaintiff whether he had been "in any altercations earlier?" Plaintiff again, in a calm and measured tone responded "no."

---

[1] Houston Rockets v. Utah Jazz (Game 3)

4

20. After several minutes elapsed, defendant Moriarty, who at this point was now just outside of plaintiff's dormitory, was heard saying on a cell phone "well if he doesn't want to press charges there's nothing I can do." It is presumed that the "he" defendant Moriarty was referring to was another unidentified shelter resident, whom according to two shelter staff employees, became involved in an earlier altercation with plaintiff. One of the two staff members informed the NYPD defendants that plaintiff was seen on one of the facility's surveillance cameras striking the unidentified resident. After approximately ten minutes passed the FDNY/EMT defendants Zucker and Guttman entered into plaintiff's dormitory. Defendant Zucker then asked plaintiff "what was going on?" Plaintiff, in a calm measured tone replied "nothing that he knew of." Defendant Zucker further asked plaintiff whether he "had been drinking earlier?" Plaintiff again in a calm and measured tone responded "I'm not at liberty to discuss my whereabouts."

21. Defendant Zucker then suddenly announced "…Listen, there's two ways we can do this, the easy way is to [voluntarily] walk downstairs to the ambulance; the second way, if you refuse, is to be taken out in handcuffs."

22. Plaintiff then inquired of defendant Moriarty was he "being arrested," to which she responded "no." Plaintiff then asked defendant Zucker "why should he go to the ambulance when he wasn't injured or otherwise under arrest?" Defendant Zucker then responded that plaintiff was being taken to the hospital: "to get checked out by the doctor, and if he says you're okay, you can come back."

23. Neither of the two shelter staff workers who were now inside of the dormitory, informed either the NYPD or EMT defendants that plaintiff posed an imminent threat to other shelter residents, staff or himself, or that he needed medical clearance from a medical professional in order to gain reentry to the shelter.

24. Notably, at no time during plaintiff's encounter with the defendants, inside of the dormitory was he ordered to sit down, stay still, nor did the NYPD defendants not allow plaintiff access to a black back-pack that he was constantly looking into while they were inside of the dormitory.

25. The dormitory at the relevant time, was in pristine-no-frills condition. There were no empty food trays, empty medication bottles or clothing strewn about the dormitory.

26. Not so long after defendant Moriarty asked plaintiff "are you going to go voluntarily to the ambulance?" Plaintiff again in a measured tone asked whether he was "being arrested?" The defendants collectively responded: "no." Plaintiff then again asked the NYPD defendants why if he "wasn't under arrest, he was being forced to go to the hospital?"

27. At this point, defendant Michael Urena, who had arrived after the FDNY/EMT defendants, ordered the other NYPD defendants to "cuff him." Plaintiff, who at this time was seated at the edge of his bed, with his hands clasped together, then without his consent, had his hands placed behind his back where the NYPD defendants proceeded to rear-handcuff him extremely tight. Plaintiff was then escorted out of the shelter into a marked FDNY/EMT vehicle.

## II. Defendants FDNY/EMT and NYPD Defendant Mesaris' Transport of Plaintiff to Lincoln Hospital

28. Plaintiff was transported to Lincoln Hospital by Defendants Zucker, Guttman, and NYPD Officer Mesaris. Plaintiff was handcuffed during the entire ride there. During the ride,

plaintiff repeatedly asked defendant Mesaris whether he was "under arrest?" Defendant Mesaris then replied that he "wasn't." Plaintiff repeatedly asked defendant Mesaris was he "free to leave?" Defendant Mesaris would repeatedly respond "no."

29. Plaintiff, still handcuffed, arrived at Lincoln Hospital at approximately between 11:50-11:55 p.m., where he was then escorted into the hospital's Emergency Room. Plaintiff asked to use the restroom, and defendant Mesaris allowed plaintiff to use it, with one handcuff still on his wrist. When plaintiff was finished, he was then re-cuffed tightly behind his back by defendant Mesaris.

30. While waiting in the hospital's Emergency Room, plaintiff repeatedly asked both defendants Mesaris and Moriarty whether he "was under arrest?" When they would respond "no," plaintiff would then aske "am I free to leave," to which they would repeatedly respond: "no." After spending almost 45 minutes in the Emergency Room, plaintiff requested access to use his cell phone in order to call his family member and let them know his whereabouts. However, defendants Mesaris and Moriarty replied "no" and refused to un-cuff him in order to use his cellular phone which was inside of the cargo pants he was wearing. Plaintiff was allowed to take his back-pack with him to the hospital.

31. After approximately one hour, plaintiff was seen by the hospital's triage nurse. When the nurse attempted to take plaintiff's vital signs, he refused any treatment by the triage nurse. Plaintiff, who was able to maintain a steady and normal gait throughout his illegal seizure and detention, was asked by the triage nurse "you don't want to be treated?" Plaintiff responded "no."

7

32. Plaintiff still handcuffed and against his will, was made to wait another hour before he was seen by an M.D. The M.D asked plaintiff questions about the time, date, and his name, which plaintiff answered to the doctor's satisfaction. The doctor then asked the NYPD defendants: "why is he here?" Defendant Moriarty then informed the doctor in sum and substance, that "shelter staff said he was acting in a belligerent manner at the shelter and that he needed to be checked out." The doctor then responded: "well I can't treat him if he doesn't want to be treated." It was at this time at approximately 1:40 a.m. on May 5, 2018 defendant Moriarity then un-cuffed plaintiff, who then proceeded to leave the hospital. Plaintiff would be remiss in pointing out that the M.D. did not ask him any questions about his mental status; whether he took psychiatric medications; whether he had any suicidal or homicidal thoughts. Also, during the commencement of the defendants' illegal seizure and transport to Lincoln Hospital, plaintiff always maintained a steady gait, and did not need to be held up by either the FDNY/EMT or NYPD defendants. Shortly after his departure from Lincoln Hospital, plaintiff telephoned the shelter and spoke to the same staff member who had spoken to the defendant earlier in the evening. The shelter staff member informed plaintiff that he had retained his bed, and that his belongings were still at the shelter. The shelter staff member did not at any time, ask for any medical documentation from Lincoln Hospital, attesting that plaintiff was seen and medically cleared to return to the shelter.

33. Earlier in the evening, prior to the collective defendants' arrival to the shelter, plaintiff went into 1214 Hoe Ave, in order to sign the facility's nightly bed roster. The subject address is comprised of three buildings, 1214; 1216 and 1218 Ave. When plaintiff entered into the 1214 building, he was required to pass through a magnometer while he was also carrying a backpack. Plaintiff objected to passing through the metal detector while carrying the bag to the

security guard stationed there, and stated in sum and substance why the security guard now wanted to follow protocols and let other shelter residents routinely break the rules. Plaintiff then left the bag on the other side of the metal detector while he walked through, and without making any contact whatsoever with the security guard, continued to the facility's Operations Office in order to sign for the bed.

## NOTICE OF CLAIM

34. Within ninety days after the claim arose, plaintiff filed a Notice of Claim upon Defendant City of New York by delivering copies of the notice by certified mail to the New York City Comptroller's Office.

35. The Notice of Claim was in writing, sworn to by plaintiff and contained his name and address.

36. The Notice of Claim set out the nature of the claim; the time when and the place where and manner by which the claim arose, and the damages and injuries claimed to have been sustained by plaintiff.

37. The City of New York has neglected and failed to adjust the claims within the statutory time period.

## CAUSES OF ACTION
## FIRST CLAIM FOR RELIEF

**(Defendant NYPD Officers Illegal Seizure and Defendant FDNY/EMTS Illegal Transport of Plaintiff to Lincoln Hospital, Violated Plaintiff's U.S. Constitutional Fourth and Fourteenth Amendments and New York State Rights against Illegal Seizure, Constituted False Imprisonment)**

38. Plaintiff, Sean Fincher, restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

39. The Fourth Amendment of the United States Constitution, which limits the powers of the states by way of the Fourteenth Amendment, in its most relevant part provides that "...[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and Warrants issue, but upon probable cause, supported by Oath, or affirmation, and particularly describing the place to be searched, and the person or things to be seized…" U.S.C.A. XIV Amendment.

40. The ultimate goal of this provision is to protect people's right to privacy and freedom from unreasonable intrusions by the government.

41. New York's Mental Health Law § 9.41, in its most relevant portion prescribes that law enforcement: "... May take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40, or, pending his examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place…" M.H.L. § 9.41

42. Section 9.01 of the M.H.L. proscribes that removal should occur when there is a "... Likelihood of serious harm be manifested, by threats of or attempts at "suicide" or "homicidal or other violent behavior…" M.H.L. §9.01

I. **The New York State Department of Health's EMT Statewide Protocol for Handling "Behavioral" Emergencies.**

43. The New York State Department of Health's "EMT Statewide Protocol" which the FDNY/EMT defendants are bound by, in its "Behavioral Emergency" subsection indicates that EMS workers should: "... Restrain, *only if necessary*, using soft restraints to protect the patient and others from harm. *Restraints should only be used if the patient presents a danger to themselves or others. Id.* at M-4 (my emphasis).

44. According to the FDNY's "Prehospital Care Report Summary" ("ACR Report"). which plaintiff obtained on May 21, 2018, the FDNY/EMT defendants: Zucker and Guttman falsely documented that "as per facility supervisor and security 'he came in, had been drinking, ran past security pushing them out of the way and ran upstairs.'" Plaintiff was not drinking inside or outside of the shelter. Defendants Zucker and Guttman further go on to falsely document that: "...facility[s] supervisor explained to PT that he could not stay in facility tonight and needed to be evaluated. PT refused to leave. NYPD 43 PCE placed PT in hard restraints and PT removed to ambulance…" However, documentation obtained by plaintiff prior to the filing of this complaint disputes the FDNY defendants' version of events.

**II. New York City Police Department's Patrol Guide - Procedure #221-13**

11

45. The NYPD's Patrol Guide - Procedure #221-13 entitled: "Mentally Ill or Emotionally Disturbed Persons" ("Directive No. 221-13") outlines the protocols NYPD officers should follow when they encounter persons who pose a danger to the public and/or themselves.

46. Directive No. 221-13 describes emotionally disturbed persons ("EDPs") as: "...A person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which the police officer reasonably believes likely to result in serious injury to himself or others." *Id* at pg.1

47. On May 4, 2018 NYPD defendants Moriaty, Mesaris, Urena, and Alba, without a warrant or probable cause, illegally seized plaintiff, who at the relevant time, was a lawful occupant of the Father Smith shelter, inside of 1218 Hoe Avenue in Bronx County, and transported him against his will, in handcuffs to Lincoln Hospital.

48. Upon the Defendants NYPD arrival inside of the shelter, Plaintiff did not among other things: threaten anyone, act in an agitated manner, possess a weapon; nor did he pose a danger to himself, shelter staff, or other shelter residents. Plaintiff was simply leaning on a locker, watching a basketball game on his cell phone with his headphones on. Plaintiff's actions and demeanor on May 4, 2018 did not come anywhere close to any of the thresholds needed to establish probable cause under New York's Mental Health Law, or contained in either of the defendant City of New York's agencies' directives.

49. As Plaintiff pointed out above, no shelter staff member informed him that he was being ejected from the shelter, until he received medical clearance from a doctor; moreover, after plaintiff was released from the NYPD defendants' illegal custody at Lincoln Hospital, he spoke to the shelter staff member, who is nothing more than an operations manager, and was informed

12

by the worker that he had retained his bed at the shelter. Nor did this worker ask plaintiff for any medical documentation from Lincoln Hospital, attesting that he be "medically cleared," upon his return to the Father Smith shelter. The defendant NYPD officers failed to investigate whether the individual who purportedly said that plaintiff "needed to be checked out" was an individual qualified under New York's Social Services Laws to read documentation plaintiff may have received from any medical professional.

50. The collective City defendants' illegal seizure and transport of plaintiff against his will to Lincoln Hospital, constitutes false imprisonment and is not otherwise privileged in that:

    (i)    the NYPD intended to confine plaintiff;

    (ii)    Plaintiff was conscious of the confinement;

    (iii)    Plaintiff did not consent to the confinement; and

    (iv)    No probable cause existed at the time of plaintiff's illegal seizure, detention, and transport

51. Moreover, the EMT defendants Steven Guttman and Andrew Zucker were complicit in the violation of plaintiff's rights by transporting him to the hospital via ambulance, and were well aware that plaintiff did not voluntarily consent to the transport.

52. By their conduct above, the individual NYPD defendants Moriarty, Mesaris, Urena, Alba, and FDNY/EMT defendants Zucker and Guttman, all of whom were acting under color of law; deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. §1983, including but not limited to, rights guaranteed to him under the Fourth and Fourteenth Amendments of the United States

Constitution. The individual defendants' conduct manifested a deliberate indifference to plaintiff's federal and state constitutional rights.

53. Accordingly, plaintiff was harmed as a direct result of the individual defendants' unlawful, unconstitutional, and discriminatory conduct, and is entitled to damages and relief in amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
Violation of Civil Rights
(Title 42 U.S.C. §1983)
(Municipal Liability against Defendant, City of New York's
Failure to Supervise NYPD Defendants)

54. Plaintiff, Sean Fincher, restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

55. 42 U.S.C. §1983 provides a remedy for individuals whose constitutional rights have been violated under color of law. The statutes' relevant portion guarantees that: "...Every person who under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..." 42 U.S.C. §1983.

56. Defendants, City of New York, the individual NYPD and FDNY/EMT defendants, are "persons" within the meaning of 42 U.S.C. §1983.

57. Plaintiff's unconstitutional seizure, and transport to Lincoln Hospital by the collective defendants, constituted false arrest and false imprisonment; and was done pursuant to "policy of inaction" by defendant City of New York as is defined under 42. U.S.C. §1983.

58. Members of the NYPD, engage in a policy and practice of unlawfully seizing and arresting individuals whose actions do not constitute grounds for probable cause of criminal activity, said persons are detained on and off of police precincts routinely in New York City.

59. Members of the NYPD also engage in a policy and practice of repeatedly using excessive force against members of the public. Such excessive force includes pushing, shoving, grabbing, punching, and striking people. In many instances this force is not used pursuant to a lawful arrest, and is mostly utilized for unjustified reasons. These physical altercations cause injuries that, in many cases, require medical care, and in some instances, death.

60. For example, over a 10-year period, the NYPD has been involved in numerous high-profile incidents that has put defendant City of New York on notice, that the need for effective supervision of NYPD was obvious. Among some of these incidents:

- In March of 2016, Otis Reese, a 30-year old Bronx man returning from a deli, was accosted by NYPD officers, who falsely accused of him of carrying an open container of beer; when in fact one of the officers is seen on the store's surveillance cameras opening the beer;[2]

- In February of 2010, an African-American restaurant owner and retired doctor, Clyde Pemberton, was falsely arrested after breaking up an

---

[2] http://www.nbcnewyork.com/news/local/Bronx-Man-Sues-NYC-1-Million-False-Arrest-Open-Bottle-Deli-NYPD-49448224.html

15

altercation between three Caucasian women at a Harlem restaurant. The criminal complaint filed against Mr. Pemberton falsely alleged that he tried to prevent the women from leaving the restaurant;[3]

- In December of 2015, an NYPD officer was convicted of fabricating the circumstances of the arrest of a N.Y. Times reporter in 2012. The officer, Michael Ackerman, alleged that a flash from the reporter's camera blinded him during a protest. It was later discovered that reporter's camera wasn't capable of producing flashes;[4]

- In September of 2018, a 19-year old delivery worker was violently apprehended by three NYPD officers in Brooklyn, while waiting to pick up a grocery order for his boss. Among the charges the officers filed against the deliveryman that was contradicted by video evidence: reckless driving, and the claims that they did not use force to subdue him;[5]

- In August of 2016, an Upper East Side army veteran, while walking his dog was stopped and taunted by NYPD officers. One of the officers is alleged to have said to him "…look, the reality is if you're a white guy on the Upper East Side, you wouldn't have been stopped";[6]

- On June 2, 2013 three Brooklyn men were stopped by NYPD officers, who accused one of them of urinating in public. The trio then alleged that

---

[3] http://www.nytimes.com/2018/09/03/nyregion/harlem-restaurant-owner-employees-sue-city-for-wrongful-arrest.html
[4] http://www.dailynews.com/new-york/judge-rips-ex-copy-lying-arrest-nyt-staffer-article-1.2453383
[5] Gothamist.com/2019/03/19/surveillance_video_appears_to_under.php
[6] Brooklyn.news12.com/story/34774139/army-vet-claims-nypd-officers-falsely-arrested-him

16

they were subjected to homophobic slurs after asking for the officers' badge numbers and then beaten;[7]

- An NYPD-school crossing guard was arrested on November 16, 2017 for filing a false arrest report against a Staten Island chiropractor;[8]

- A Brooklyn man was awarded Three-Million dollars after NYPD officers beat the man in front of his son in April of 2014;[9]

- An off-duty police officer was handcuffed, beaten with batons, and pepper sprayed in Queens in 2010, the officer subsequently suffered a broken hand;[10]

- In probably the most high-profile incident involving a false arrest by the NYPD, former professional tennis player, James Blake, was tackled by an NYPD officer outside of Grand Central Station after being mistaken for another suspect in a credit-card scam ring on September 9, 2015;[11]

- In April of 2015 an NYPD officer cited for illegally detaining and frisking an African-American man in Staten Island;[12]

---

[7] https://www.gaycitynews.nyc/stories/2013/12w6900-gay-men-claim-police-violence-anti-gay-false-arrest-in-brooklyn-2013-06-11.html
[8] https://www.silive.com/news/2018/08/nypd-crossing-guard-admits-to.html
[9] https://www.dailynews.com/new-york/nyc-crime/ny-metro-beatdown-jury-verdict-against-nypd-20180604-story.html
[10] https://www.dnainfo.com/new-york/20160204/st-albans/off-duty-nypd-officer-beaten-by-police-his-home-awarded-15m-by-city/
[11] https://nypost.com/2018/08/01tennis-star-james-blake-slams-de-blasio-nypd-over-false-arrest/
[12] https://wsj.com/articles/581001424052970204479504576637463643538104

17

- On March 27, 2013 a 21 year-old, self-described activist from Brooklyn, was arrested the NYPD after advocating that a "bounty" be placed on NYPD officers online after the cop-related shooting of 16 year-old Kamani Gray in the same borough;[13]

- In March of 2016, after telling the driver of an unmarked police car to "slow down," an on-duty postal worker was handcuffed and arrested by NYPD officers. Then NYPD Commissioner, Bill Bratton commented after seeing the video of the arrest, that he "didn't like what he saw;"[14]

- In February of 2018, four NYPD officers were tried in federal court, for allegedly falsifying arrests in order to obtain overtime pay. The trial stemmed from the false arrest of a man on trumped up felony drug possession charges;[15]

- In October of 2016, a 16 year-old Staten Island teen returning from a grocery store, was arrested and falsely charged with a mugging by the NYPD

- In March of 2017, two NYPD detectives, Kevin Desormeau and Sasha Neve were indicted by a Queens grand jury after falsely accusing a

---

[13] https://dailynews.com/new-york/nyc-crime/man-sues-nypd-false-arrest-bounty-case-article-1.1868429
[14] Archive.massappeal.com/postal-worker-will-sue-nyc-over-false-arrest-by-NYPD/
[15] https://www.dailykos.com/stories/2018/2/21/1743413/-NYPD-officers-on-trial-for-arresting-someone-just-to-rack-up-overtime-pay?

Queens resident of selling drugs in August of 2014. The two detectives were also facing similar charges in Manhattan, for making false statements in a gun arrest in Washington Heights;

- In 2015, three members of the Illuminator Art Collective, filed a lawsuit against the NYPD for false arrest and seizure of their property at a protest held outside of the Metropolitan Museum of Art on September 9, 2014;

- In 2014, a Cardozo Law School student was arrested by two NYPD officers after he questioned them about illegally parking at a bus stop while they were up food from a food truck. The charges, disorderly conduct, were later dropped.

61. Upon information and belief, defendant City of New York, was aware, or in the exercise of reasonable diligence should have been aware, of reports and complaints against the NYPD with respect to the use of excessive force and/or mistreatment of persons with purported mental illness issues prior to May 4, 2018, but failed to take reasonable disciplinary or other corrective action to prevent misconduct. That failure to take corrective action constitutes deliberate indifference that caused the assault, mistreatment, illegal seizure, detention and transport of plaintiff against his will, to Lincoln Hospital.