

**JAMES E. JOHNSON**
*Corporation Counsel*

THE CITY OF NEW YORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**EVAN J. GOTTSTEIN**
*Assistant Corporation Counsel*
Phone: (212) 356-2262
Fax: (212) 356-3509
egottste@law.nyc.gov

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/7/2021

October 29, 2020

**BY ECF**

Honorable Mary Kay Vyskocil
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:  **Sean Fincher v. City of New York, et al.**
            **19 CV 6206 (MKV)**

Your Honor:

    I am the Assistant Corporation Counsel in the Office of James E. Johnson, Corporation Counsel of the City of New York (the "City") assigned to the defense of the above-referenced matter. For the reasons set forth below, it is respectfully requested that the Court strike from the docket: (1) plaintiff's original complaint that was attached as an exhibit to his second amended complaint (ECF No. 66-2); (2) plaintiff's original complaint as initially filed on July 1, 2019 (ECF No. 2); and (3) plaintiff's first amended complaint (ECF No. 19). As set forth in further detail below, these complaints contain allegations which plaintiff has acknowledged are false and also that he knew them to be false at the time he initially filed these documents.

    On July 1, 2019, plaintiff commenced this action by filing a complaint regarding an incident that occurred at the Father Smith Homeless Shelter located in Bronx, New York, on May 4, 2018. (ECF No. 2) In that first complaint, plaintiff alleged that defendant NYPD officers threw him to the floor and placed their knees in his back, neck, and shoulder areas as they secured him in handcuffs – facts that plaintiff subsequently acknowledged that he knew to be false at the time he submitted this complaint. (<u>See</u> Exhibit A, Excerpts from Deposition of

Sean Fincher Conducted on September 21, 2020 ("Fincher Dep."), 148:1-3, 148:20-149:8, 154:22-25, 155:20-156:6, 157:12-158:3)[1]

On November 8, 2019, plaintiff filed a (first) amended complaint ("FAC"), which added new named defendants but kept the allegations that plaintiff knew were false.[2] (See ECF No. 19)  On November 27, 2019, the City produced the defendant officers' body-worn camera footage of the incident at issue, which clearly depicted the NYPD defendants placing handcuffs on plaintiff without throwing him to the floor or placing any of their knees on any part of plaintiff's body. (See Ex. A, Fincher Dep., 179:9-180:12)  Plaintiff did nothing at that time to amend his pleading to remove the obviously false allegations. (Ex. A, Fincher Dep., 182:7-22)

Following the post-discovery conference held before Your Honor on October 15, 2020, plaintiff agreed to file a second amended complaint ("SAC") omitting any allegations of NYPD defendants throwing plaintiff to the floor or placing their knees on him.  On October 23, 2020, the SAC was entered on the docket; however, annexed thereto as an exhibit was a copy of the original complaint which, of course, contained the false allegations at issue. (See ECF Nos. 66, 66-2)

Plaintiff's reasons for including his original complaint at ECF No. 66-2 are unclear, but whatever the intended goal, including the deleted false material defeated the purpose of amending the complaint to omit the false allegations.  Plaintiff's filing of the attachment has the effect of either re-alleging those same falsehoods, or, at a minimum, republicizing them.

The attachment of the prior complaint should be stricken from the docket pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, which provides that the Court may strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading.  The prior false pleading meets all of the criteria spelled out in Rule 12(f), because it is redundant and immaterial *per se*, and contains "scandalous" allegations that plaintiff acknowledges are false.  Moreover, these false allegations are especially inflammatory in light of public outcry in the months following the death of George Floyd concerning the use of force by police, including the specific type of force that is falsely alleged in the prior complaints, e.g., placing knees on plaintiff's neck.

Further, these knowingly false allegations egregiously harm defendants' reputations by reiterating false allegations in a permanent and public record.  Increasingly, litigation records are systematically processed and publicized in internet databases of allegations for the express purpose of impugning the credibility and character of police officers (including during cross examination in criminal cases). See, e.g., https://www.capstat.nyc/ (public database purporting to contain allegations in federal lawsuits against police officers).  Moreover, these

---

[1] Defendants interpret ¶ 5.B of Your Honor's Individual Rules of Practice in Civil Cases to require a courtesy copy of the entire deposition transcript when defendants file their motion for summary judgment; therefore, we have attached only the relevant excerpts of that transcript as Exhibit A to this application.  However, to the extent the Court so requires, defendants can forward a copy of the entire transcript before submitting their summary judgment motion.

[2] The FAC did not contain the original complaint attached as an exhibit.

false allegations can result in prejudice to the defendant officers by tainting the jury pool as against these specific officers.

The same is true for the two prior iterations of plaintiff's complaint (ECF No. 2 and No. 19), which contained the same false and scandalous allegations, at a time when plaintiff knew them to be false. Therefore, these prior complaints should be stricken as well, for the same reasons.

When mere allegations in federal lawsuits seeking money damages are systematically publicized to impugn the character of police officers, the Courts should not allow the reckless seeding of the public record with defamatory statements against public servants. That is especially so when those allegations are admitted by the plaintiff to be false. Accordingly, defendants respectfully request that the Court strike and remove the plaintiff's prior complaints, filed at ECF No. 66-2, No. 19, and No. 2) from the docket, leaving only the second amended complaint, at ECF Nos. 66 and 66-1, as the only operative and publicly available pleading in this case.

Defendants thank the Court for its time and consideration in this matter.

Respectfully submitted,

*Evan J. Gottstein*   /s/
Evan J. Gottstein
Assistant Corporation Counsel
Special Federal Litigation Division

cc: (Via E-Mail)
Sean Fincher
*Plaintiff Pro Se*
28-66 College Point Boulevard, Rm. 217
Flushing, New York 11354
Finchersean243@gmail.com

---

The request to strike from the record Plaintiff's earlier pleadings is DENIED. The First Amendment and the common law establish a strong presumption of public access to judicial documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Moreover, the Second Circuit has long instructed courts "not [to] tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). The falsity of allegations is not sufficient. *See Acco, Ltd. v. Rich Kids Jean Corp.*, No. 15-cv-7425 (JSR), 2016 WL 3144053, at *3 (S.D.N.Y. Apr. 11, 2016). Rather, the movant must show that failing to strike the pleading "would result in prejudice." *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001). Insofar as the record reflects that Plaintiff filed a superseding pleading and admitted the falsity of his earlier allegations, the mere existence of his earlier pleadings in the record does not prejudice the defendants.

Date: July 7, 2021
New York, New York

*Mary Kay Vyskocil*
Mary Kay Vyskocil
United States District Judge

# EXHIBIT A

```
 1  UNITED STATES DISTRICT COURT:
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------------------------------X
    SEAN FINCHER,
 3
                                        PLAINTIFF,
 4
            -against-                   Index No:
 5                                      19 Civ. 6206 (LGS)
 6  THE CITY OF NEW YORK; NYPD OFFICER LAUREN MORIARTY
    (Shield #14377) (In Her Individual and Official
 7  Capacities); NYPD OFFICER JOSEPH MESARIS (Shield #16202)
    (In Her Individual and Official Capacities); NYPD
 8  SERGEANT MICHAEL URENA (Shield #1095)(In His Individual
    and Official Capacities); NYPD OFFICER STEPHANIE ALBA
 9  (Shield #: 19604)(In Her Individual and Official
    Capacities);  FDNY/EMT STEPHEN GUTTMAN (Shield #5287)(In
10  His Individual and Official Capacities); FDNY/EMT ANDREW
    ZUCKER (Shield #1463)(In His Individual and Official
11  Capacities)
12                                      DEFENDANTS.
    ------------------------------------------------------X
13
                   DATE:  September 21, 2020
14                 TIME:  10:09 A.M.
15
16
17         CONTINUED EXAMINATION BEFORE TRIAL of the
18  Plaintiff, SEAN FINCHER, taken by the Defendant,
19  pursuant to a Notice, held at the offices of JAMES E.
20  JOHNSON, CORPORATION COUNSEL, 100 Church Street, New
21  York, New York 10007, before Jasmin Omozusi, a Notary
22  Public of the State of New York.
23
24
25
```

Sean Fincher

Page 147

1 do to get you into handcuffs?
2     A. They pulled my arms apart and put them
3 behind my back.
4     Q. And did they use any type of force
5 against you when they were doing that?
6     A. Well, yeah, if you put your arms-- if you
7 forcibly put somebody arms behind their back, that's
8 force. That is force.
9     Q. And once they got the handcuffs -- once
10 they got your hands into the handcuffs, were you still
11 sitting on your bed?
12     A. Yes.
13     Q. And what happened once the handcuffs were
14 on you?
15     A. Well, they lifted me up and then we
16 walked out.
17     Q. Did they ever throw you to the ground at
18 any point?
19     A. It felt like it. It felt like I was
20 going to the ground.
21     Q. But did you ever go from sitting on your
22 bed to the floor of the dorm room that you were in?
23     A. I don't know if I actually completely
24 went down. I think I partially went down, like kind of
25 to the knee. But almost touching the floor.

Page 148

1     Q. And did any officers place any knees on
2 you at any point?
3     A. No.
4     Q. Now, do you still have a copy of the
5 amended complaints in front of you that was marked at
6 Exhibit E?
7     A. Yes.
8     Q. I'd like to direct your attention to
9 paragraph 27, and starting at the second sentence you
10 wrote: Plaintiff who was at this time, or who at this
11 time was seated at the edge of his bed with his hands
12 clasped together was then grabbed and forcefully thrown
13 to the floor by all of the NYPD Defendants.
14     Now, are you claiming that any of the NYPD
15 Defendants officers threw you to the ground?
16     A. Close to it.
17     Q. But to be clear, none of the police
18 officers actually threw you to the ground?
19     A. No.
20     Q. Now, the next sentence of that paragraph
21 reads "with their knees in Plaintiff's back, neck and
22 shoulder areas, they then placed his hands behind his
23 back and proceeded to rear handcuff him extremely
24 tight."
25     Now, you just stated that the officer did not

Page 149

1 actually put their knees on you at any point; is that
2 correct?
3     A. That's correct.
4     Q. So the statement in your amended
5 complaint at paragraph 27 that the officers had their
6 knees in Plaintiff's back, neck and shoulder areas, that
7 statement is not true?
8     A. Not true.
9     Q. Then why did you include that in your
10 complaint if it was not true?
11     A. Felt like it at the time. These are big
12 officers, at least Mesaris is like built like a
13 fullback. Sergeant Urena isn't a small guy either.
14     Q. Now, at what point in the sequence did it
15 feel like that officers had placed their knees on you?
16     A. When they put my arms behind my back.
17     Q. When they first got your hands behind
18 your back?
19     A. Yeah.
20     Q. How long were your hands behind your back
21 before the handcuffs were on?
22     A. Couldn't have been no more than three
23 seconds.
24     Q. Once the handcuffs were on, did it still
25 feel like someone had placed a knee on you?

Page 150

1     A. I was in a lot of pain.
2     Q. But did it feel like someone had placed a
3 knee on you once the handcuffs were on?
4     A. No.
5     Q. Once the handcuffs were on, you said you
6 were still feeling pain?
7     A. Yes.
8     Q. Where on your body were you feeling pain
9 once the handcuffs were on?
10     A. My neck and my back.
11     Q. What side?
12     A. Primarily the left side.
13     Q. What position were you in when it felt
14 like someone's knee was on you?
15     A. When you say position, it felt like
16 basically I was kind of like bent over.
17     Q. Were you still sitting on the bed?
18     A. Sitting, yes.
19     Q. And other than your feet, was any part of
20 you touching the ground?
21     A. No.
22     Q. Did you complain of pain at any point?
23     A. No, I'm an athlete. Athletes don't
24 complain about pain.
25     Q. So you didn't tell the police officers

14 (Pages 147 - 150)

Diamond Reporting
877.624.3287    A Veritext Company    www.veritext.com

Sean Fincher

Page 151

1 that anything that they were doing was hurting you?
2 　　A. They wouldn't care. If they did, they
3 wouldn't have done it in the first place.
4 　　Q. Well, did you tell them that you were in
5 pain while they were handcuffing you?
6 　　A. No.
7 　　Q. You said once the handcuffs were on you,
8 you said the officers stood you up off the bed.
9 　　A. Yes.
10 　　Q. What happened after that?
11 　　A. They marched me outside of the room down
12 the stairs outside the shelter into an ambulance.
13 　　Q. And at any point during that walk from
14 the room to the ambulance, did you tell any of the
15 officers that you were in any pain?
16 　　A. No.
17 　　Q. Did you say anything to the officers
18 during that walk from the room to the ambulance?
19 　　A. No.
20 　　Q. Did you say anything to the defendants
21 after you were handcuffed?
22 　　A. I believe once we got inside, I went
23 into -- I was escorted into the ambulance, and I rode in
24 the ambulance with-- well, the two EMS workers and
25 Mesaris.

Page 152

1 　　Q. Did you say anything to them in the
2 ambulance?
3 　　A. I believe I said why -- I said -- it had
4 something to do with my bag, but I couldn't remember
5 what it was. I had a backpack. I had a backpack on.
6 　　Q. Oh, did you say you said something about
7 your bag or your back?
8 　　A. The bag. The bag. The actual backpack.
9 　　Q. How long when you got into the ambulance
10 outside of the shelter until you got to the hospital,
11 how long did it take?
12 　　A. Wow, I thought it was a little too long.
13 I don't know. It could have been like fifteen minutes
14 maybe.
15 　　Q. What hospital did you go to?
16 　　A. Lincoln, I think.
17 　　MR. GOTTSTEIN: Off the record.
18 　　(Whereupon, an off-the-record discussion was
19 held.)
20 　　Q. Now, Mr. Fincher, I want to go back to
21 some of the statements that are alleged in the complaint
22 of the amended complaint that is marked as Exhibit E
23 now. In paragraph seven, you wrote, "Plaintiff, who at
24 this time was seated at the edge of his bed with his
25 hands clasped together was then grabbed and forcefully

Page 153

1 thrown to the floor by all of the NYPD Defendants."
2 　　Now, when you wrote this in your amended
3 complaint, you knew that it was false?
4 　　A. I don't know it was false. It just felt
5 like it at the time.
6 　　Q. But when you wrote this complaint, you
7 didn't write that it felt like you were thrown to the
8 ground, right?
9 　　A. Right.
10 　　Q. You wrote that you were, in fact, thrown
11 to the floor by all of the NYPD Defendants.
12 　　A. Right.
13 　　Q. And you knew that regardless of what you
14 felt like was happening, that they did not actually
15 throw you to the ground.
16 　　A. You have to rephrase the question.
17 　　Q. Now, you said that it felt like you were
18 thrown to the ground?
19 　　A. Right.
20 　　Q. When you wrote this complaint, this
21 amended complaint, you did not write that it felt like
22 officers threw you to the ground.
23 　　A. Correct.
24 　　Q. What you wrote was that they did, in
25 fact, grab you and forcefully throw you to the floor.

Page 154

1 　　A. Correct.
2 　　Q. So you knew when you wrote this that they
3 did not actually throw you to the ground?
4 　　A. Well, it felt like it.
5 　　Q. But you knew that it didn't actually
6 happen?
7 　　A. I actually couldn't remember whether it
8 actually happened.
9 　　Q. So are you saying that when you wrote the
10 amended complaint, you believed that you were, in fact,
11 thrown to the floor?
12 　　A. Well, it felt like it.
13 　　Q. Well, I'm asking if you knew if that is,
14 in fact, what happened?
15 　　A. It happened so fast, I couldn't even
16 remember.
17 　　Q. So when you wrote this complaint, you
18 weren't sure if you were, in fact, thrown to the floor?
19 　　A. It felt like I was thrown to the floor,
20 like close to the floor. They were all like leaning--
21 putting all their weight on me.
22 　　Q. But when you wrote your amended
23 complaint, you didn't know if you were, in fact, thrown
24 to the ground.
25 　　A. I can't-- yeah, I could say that.

Page 155

1  Q. So when you wrote your amended complaint,
2 what did you remember about the incident when you were
3 placed in handcuffs?
4  A. I remember all of their weight, or most--
5 at least two of them, their weight like all on top of
6 me.
7  Q. And specifically why did it feel like you
8 were thrown to the floor?
9  A. I mean, Officer Mesaris is a big guy.
10  Q. So is it your claim that it felt like
11 Officer Mesaris threw you to the floor?
12  A. It's not my claim. I'm saying that's
13 what it felt like, yeah.
14  Q. When you wrote this amended complaint,
15 based on your recollection at the time, did it feel like
16 you were laid out flat on the ground?
17  A. No, no. No.
18  Q. Did it feel like your head was against
19 the grounds?
20  A. No, I was just -- I was bent over like
21 bent over like going over toward the floor, or it felt
22 like kind of like, you know, on the floor.
23  Q. No, I'm just trying to get the details of
24 how it felt you were on the floor. So if it didn't feel
25 like you were flat on the floor, what position did it

Page 156

1 feel like you were in on the floor?
2  A. Well, not on the floor. It just felt
3 like I was bent over going to the floor.
4  Q. So it didn't feel like you were actually
5 on the floor at all?
6  A. No.
7  Q. Now, earlier when you said that Officer
8 Mesaris is a big guy, does that just mean that he could
9 have thrown you to the ground if he tried?
10  A. If he tried? Wait, just say the question
11 again.
12  Q. Earlier when you said that Officer
13 Mesaris is a big guy, do you mean that he would have
14 been able to throw you to the ground?
15  A. I have to object. All I said was Officer
16 Mesaris was a big guy. Could he have thrown me to the
17 ground? That's just like -- that's -- you know, that's
18 just speculation. I don't understand.
19  Q. Well, I was asking what you meant when I
20 had asked why did you believe that -- of why did it feel
21 like they had thrown you to the floor. And you said
22 Officer Mesaris was a big guy. I'm trying to understand
23 what you meant when you said that Officer Mesaris was a
24 big guy in response to the question why it felt like you
25 were thrown to the ground.

Page 157

1  A. Well, all of their weight was on top of
2 me.
3  Q. What do you mean by all of their weight
4 was on top of you?
5  A. That's what it felt like.
6  Q. If you were sitting on the bed, where on
7 your body did it feel like all of their weight was on?
8  A. My back and my neck.
9  Q. And is that while you were sitting
10 upright?
11  A. Yes.
12  Q. Now, in your complaint, you also wrote:
13 "With their knees in Plaintiff's back, neck and shoulder
14 area, they then placed his hands behind his back and
15 proceeded to rear handcuff him extremely tight."
16  When you wrote this amended complaint, you
17 knew that that statement was false, that there-- about
18 the officers' knees being in Plaintiff's back, neck and
19 shoulder areas?
20  A. Well, that's what it felt like.
21  Q. But you didn't write in your complaint
22 that it felt like they had knees in your back, neck, and
23 shoulder areas.
24  A. No.
25  Q. When you wrote this complaint, you knew

Page 158

1 that it didn't actually happen, that their knees were on
2 you?
3  A. Yeah, I knew that.
4  Q. Now, have you seen officer's body-worn
5 camera video that was produced to you for this case?
6  A. Yes.
7  MR. GOTTSTEIN: I'll go up to the computer
8 screen to play some of those videos.
9  Q. I'm going to take you through some of
10 those videos which include body-worn camera video of
11 Officer Mesaris, Lieutenant Urena who was Sergent Urena
12 at the time, and Officer Alba.
13  These videos were designated with the Bates
14 stamp number D18 through D21. This first clip that I'm
15 playing is from Lieutenant Urena's body camera video,
16 and that video had the Bates stamp number D18. And I
17 will be playing from the elapsed time
18 six-minutes-and-37-seconds through seven minutes.
19  [Whereupon, video is played.]
20  Q. Mr. Fincher, do you agree that in that
21 portion of the video Lieutenant Urena had told the EMTs
22 that: "From what we got, he's an intox and was acting
23 violently towards staff"?
24  A. That's what I heard him say.
25  Q. And do you agree that Officer Moriarty

Sean Fincher

Page 179

1 left wrist?
2     A. Right.
3     Q. And at that point, both of your arms were
4 behind your back?
5     A. Yes.
6     Q. Now, once both of those -- both handcuffs
7 were on, the officers stopped using any type of force?
8     A. Yes.
9     Q. So you were not on the floor at any time
10 while the police were with you, correct?
11     A. No.
12     Q. And do you agree that this video shows
13 that the police never threw you to the ground?
14     A. Yes.
15     Q. Sorry, just to clarify, you agree that
16 the video does not show that?
17     A. Right, the video doesn't show that.
18     Q. So that never happened, correct?
19     A. Right, never happened.
20     Q. And the video also does not show any
21 officers placing knees on your back?
22     A. No, it don't.
23     Q. And it also doesn't show officers placing
24 any knees on your neck?
25     A. No.

Page 180

1     Q. And it doesn't show them placing knees on
2 either of your shoulders.
3     A. No.
4     Q. So they did not, in fact, place any knees
5 on your back?
6     A. No.
7     Q. And they didn't place any knees on your
8 shoulders?
9     A. No.
10     Q. And they didn't place any knees on your
11 neck?
12     A. No.
13     Q. Now, I'm going to play Officer Alba's
14 body camera video, which was Bates stamp number D21, and
15 designated as Exhibit I. I will be playing from the
16 elapsed time of thirteen-minutes-and-zero-seconds until
17 the end of the video.
18     [Whereupon, the video is played.]
19     Q. Now, Mr. Fincher, the rest of that video
20 that I just played doesn't show any officers using force
21 on you after you were placed in handcuffs, correct?
22     A. Correct.
23     Q. Now, after that video stops recording,
24 when you were outside the ambulance, did any Defendants
25 use any physical force on you after that?

Page 181

1     A. No.
2     Q. Now, in any of the videos that we've just
3 watched, you did not complain that you were in any pain?
4     A. No.
5     Q. And you also did not say anything to the
6 officers about the handcuffs being too tight?
7     A. No.
8     Q. And you did not say anything about a knee
9 being in your back or neck or shoulder, right?
10     A. No, not in front of them.
11     Q. Did you say it to someone else that
12 night?
13     A. No.
14     Q. Now, when was the first time that you
15 watched these body camera videos that were produced to
16 you in this case?
17     A. When you produced them to me.
18     Q. Would that be-- so did you watch them the
19 same date that I produced them to you?
20     A. Oh, yeah.
21     Q. Could you remember what date that was?
22     A. No.
23     Q. Do you remember the month?
24     A. It could have been December.
25     Q. So it's fair to say that you first

Page 182

1 watched these videos in December of 2001 nine?
2     A. Right.
3     Q. When you watched these videos for the
4 first time, did you watch all of the videos in their
5 entirety?
6     A. Oh, yes.
7     Q. Now, when you watched these videos, you
8 saw that you were not, in fact, thrown to the ground by
9 police officers at any point, correct?
10     A. Correct.
11     Q. And you also saw that none of them placed
12 any of their knees on you at any point?
13     A. Correct.
14     Q. And from December of 2019 when you first
15 saw these videos until now, you have not amended your
16 complaint to correct the statement that they had put
17 their knees in your back, neck and shoulder areas?
18     A. No.
19     Q. And you also did not amend your complaint
20 after seeing these videos to correct the statement about
21 officers grabbing and throwing you to the ground?
22     A. No.
23     Q. Now that you have seen the video evidence
24 that directly contradicts the allegations of the force
25 used that you stated in your amended complaint, will you

22 (Pages 179 - 182)

Diamond Reporting
877.624.3287    A Veritext Company    www.veritext.com