USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/29/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEAN FINCHER,

Plaintiff,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

1:19-cv-6206 (MKV)

**ORDER GRANTING SUMMARY JUDGMENT**

MARY KAY VYSKOCIL, United States District Judge:

This case comes before the Court on a Motion for Summary Judgment, or in the alternative a Motion for Judgment on the Pleadings. Plaintiff Sean Fincher filed a Second Amended Complaint [ECF No. 66] against New York Police Department Officers Lauren Morriarity, Joseph Mesaris, Stephanie Alba, and Michael Urena (the "NYPD Defendants"), and New York Fire Department and EMT Defendants Andrew Zucker and Stephen Guttman (together, the "Individual Defendants") and the City of New York, alleging various violations of his state and federal constitutional rights. Defendants moved for Summary Judgment or for Judgment on the Pleadings [ECF No. 71] and filed a Memorandum of Law in Support. [Defs. Mem., ECF No. 74]. Plaintiff thereafter opposed the motion [Pl. Opp., ECF No. 81], and Defendants filed a reply [Defs. Reply; ECF No. 86]. Having carefully reviewed the record, the Court grants Defendants' Motion for Summary Judgment. [1]

[1] Because the Court grants Defendants' Motion for Summary Judgment, the Court need not address the request for Judgment on the Pleadings.

**BACKGROUND**

The following facts are drawn from Plaintiff's 56.1 Counterstatement and are construed in the light most favorable to Plaintiff, the non-moving party, for purposes of the Motion for Summary Judgment. *Hancock v. Cty. of Rensselaer*, 882 F.3d 58, 64 (2d Cir. 2018).[2]

In May 2018, Plaintiff was a resident of the Father Smith Residence, a homeless shelter in the Bronx. 56.1 ¶¶ 14-15. One night when Plaintiff came home to the shelter, the security officer asked to search his backpack. 56.1 ¶ 17. Plaintiff refused and headed to the building of the shelter in which his bed was located. 56.1 ¶¶ 20, 23. When he reached that building, another security officer stopped him, after which Plaintiff "argued with another resident" "who asked plaintiff if he 'want[ed] to go outside.'" 56.1 ¶¶ 24-25.

Plaintiff understood that the other resident meant they "would be going outside the building to physically fight." 56.1 ¶ 26. Once outside, Plaintiff punched the other resident. 56.1 ¶ 27. A shelter security officer was present "when plaintiff punched the other resident in the face." 56.1 ¶ 29. After the fight, Plaintiff headed to his bedroom. 56.1 ¶ 31.

A shift supervisor at the shelter called 911 "to report plaintiff's assault on the other resident." 56.1 ¶¶ 32-33. She told "the 911 operator that Plaintiff had refused to be checked by the security guard for weapons, that plaintiff had assaulted more than one person, and was possibly intoxicated." 56.1 ¶ 34. This information was then communicated to Defendants OfficersMoriarty and Mesaris, who headed to the shelter. 56.1 ¶¶ 36-37. Once the officers arrived, shift supervisor David Ortiz told them "that plaintiff had assaulted another resident of the shelter by punching him in the face, and that the assault had been seen on footage from the

---

[2] The Court cites to the Plaintiff's 56.1 Counterstatements ("56.1") as it incorporates the parties' assertions of material facts and responses. (*See generally* Defs.' 56.1 Response [ECF No. 73]; Pl.'s 56.1 Response [ECF No. 82]).

shelter's security cameras." 56.1 ¶ 40. Other "[s]helter employees and security officers further reported that plaintiff had acted violently towards one of the security officers by physically pushing the security officer when [he] asked plaintiff to check his bag for weapons." 56.1 ¶ 41. Mr. Ortiz then told the officers that Plaintiff should be taken to a hospital to be evaluated, "and only return to the shelter after hospital staff determined he no longer presented a risk to the safety of others at the shelter." 56.1 ¶ 42.

When asked about the events of the evening, Plaintiff said "he did not know of anything that happened." 56.1 ¶ 44. Mr. Ortiz then entered the room and said that Plaintiff had punched someone in the face and that he "was a danger to the staff and residents of the shelter, and that plaintiff should go to the hospital to . . . calm down, and come back when he was [not] aggressive." 56.1 ¶ 47. As this dialogue was occurring, Defendants Officers Urena and Alba arrived at the shelter. 56.1 ¶ 49. Officers Moriarty, Mesaris, Alba, and Urena, "then waited outside plaintiff's bedroom until EMS arrived." 56.1 ¶ 51. Defendants Guttman and Zucker arrived shortly thereafter, and the officers told them that "they had been told plaintiff was intoxicated, had been acting violently towards shelter staff, and had punched another individual in the face." 56.1 ¶¶ 53-54. Plaintiff refused to answer any of the questions Defendants Guttman and Zucker asked about the events of the evening. 56.1 ¶¶ 56-58.

Defendants Guttman and Zucker then told Plaintiff that he "needed to go [to the] hospital and get discharge papers stating that he was okay and the shelter would then allow him to return." 56.1 ¶ 61. Plaintiff was explicitly told by the officers that "he could either walk to the ambulance and be taken to the hospital voluntarily[,] or he could be taken there in handcuffs." *See* 56.1 ¶ 62. "Plaintiff refused to voluntarily leave the shelter." 56.1 ¶ 63. Mr. Ortiz then reiterated that Plaintiff had to go to the hospital to be evaluated and that as shift supervisor he

was in charge of the shelter. 56.1 ¶¶ 66-68. After Plaintiff told Mr. Ortiz that he wasn't "in charge of nothing," and that he should "[g]o play in traffic," Mr. Ortiz said to Officer Urena that "this is exactly why I said it was a safety issue." 56.1 ¶¶ 69-70. Officer Urena then began to handcuff Plaintiff and asked if he would cooperate and leave. *See* 56.1 ¶¶ 74, 75. After Plaintiff said he would not leave, the NYPD Defendants placed Plaintiff in handcuffs. 56.1 ¶¶ 75-76.

Plaintiff was taken by ambulance to Lincoln Hospital in the Bronx. 56.1 ¶ 82. When Plaintiff asked if he could use his phone during the ride, Officer Mesaris told him he could do so once the handcuffs were removed at the hospital. 56.1 ¶¶ 84-85. Once at the hospital, Plaintiff told two triage nurses and a doctor that he was fine and did not want medical treatment. 56.1 ¶¶ 87-90. Once a doctor confirmed that Plaintiff "knew his name, the date, and the time," his handcuffs were removed. 56.1 ¶¶ 91-92. Plaintiff then called the shelter and later returned to the shelter. 56.1 ¶¶ 94-96.

A few months later, Plaintiff filed this lawsuit. *See* Complaint [ECF No. 1].

## LEGAL STANDARD

"Summary judgment is appropriate only when, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (citation omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A material factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). If the moving party satisfies its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson*, 477 U.S. at 249). The opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts' and 'may not rely on mere speculation or conjecture.'" *PACA Tr. Creditors of Lenny Perry's Produce, Inc. v. Genecco Produce Inc.*, 913 F.3d 268, 275 (2d Cir. 2019) (first quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); then quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (noting that the opposing party "must offer some hard evidence showing that its version of the events is not wholly fanciful").

"In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party." *Hancock*, 882 F.3d at 64. The same standard applies where, as here, both parties move for summary judgment: "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## DISCUSSION

In his Second Amended Complaint, Plaintiff, who is proceeding *pro se*, alleges numerous violations of state and federal constitutional rights. The Court construes the Second Amended Complaint liberally and interprets it to "raise the strongest arguments that [it] suggests." *Triestman v. Fed Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006 (per curiam). Plaintiff asserts claims that he was falsely arrested, Am. Compl. ¶ 39, that the City failed to supervise and train the Individual Defendants, Am. Compl. ¶¶ 55-69, that Defendant Urena failed to intervene,

Am. Compl. ¶ 88, that the denial of the use of a cellphone while handcuffed violated his right to familial associations, Am. Compl. ¶ 93, and that the NYPD Defendants used excessive force in placing the handcuffs on him, Am. Compl. ¶ 96. In his Opposition to Defendants' Motion for Summary Judgment on these claims, Plaintiff contends that his right to deny medical treatment was infringed. Pl. Opp. at 10. The Court first addresses the alleged federal constitutional violations before determining whether Plaintiff may bring state-level claims in this case.

## I. PLAINTIFF FAILS TO STATE A FALSE ARREST CLAIM

Plaintiff alleges that the Individual Defendants violated his "Fourth and Fourteenth Amendment" rights by handcuffing him and transporting him to the hospital. *See* Am. Compl. ¶ 50-52. He asserts a Section 1983 claim for this purported false arrest. Am. Compl. ¶ 52.

To prevail on a claim under Section 1983, a plaintiff must establish "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254-57 (1978)). There is no dispute in this case that Defendants acted under color of state law.

In analyzing a claim for false arrest under Section 1983, courts look to the law of the state in which the arrest occurred. *Jaegly v. Couch*, 439 F.3d 149, 151–52 (2d Cir. 2006) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). To prevail on a claim for false arrest under New York law, the plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d

Cir. 2012) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)). An arresting officer may avoid liability for a claim of false arrest by demonstrating either that he had probable cause for the arrest or that he is protected from liability because he has qualified immunity. *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

Probable cause "is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. and N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)). "Probable cause to arrest exists when the officers have reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (ellipses and alteration omitted) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). In determining whether an officer had probable cause, courts may consider only "those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis omitted) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)). A false arrest claim "turns on whether probable cause existed to arrest *for any crime*, not whether probable cause existed with respect to each individual charge." *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012) (emphasis added) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153-56 (2004)).

At the summary judgment stage, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852 (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118–19 (2d Cir. 1995). "Even where factual disputes exist, . . . a § 1983 claim may

fail if the plaintiff's version of events establishes probable cause to arrest." *Jackson ex rel. Jackson v. Suffolk County*, 87 F. Supp. 3d 386, 404 (E.D.N.Y. 2014) (quoting *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998).

Plaintiff spends the large portion of his opposition arguing that no probable cause existed under various provisions of New York's Mental Health Laws. *See* Pl. Opp. at 11-19. But the question of whether probable cause exists is directed at *any* crime. Here, the undisputed evidence, even when viewed in Plaintiff's favor, is sufficient to conclude that there was probable cause to arrest Plaintiff for assault.

Under the New York Penal law, "a person is guilty of assault in the third degree when: [w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person; or [h]e recklessly causes physical injury to another person." § 120.00 (1)-(2). It is undisputed that Plaintiff punched another resident of the shelter. 56.1 ¶ 27. Plaintiff admits that an employee of the shelter called 911 "to report plaintiff's assault on the other resident." 56.1 ¶ 33. At that time, the 911 operator was told that "plaintiff had refused to be checked by the security guard for weapons, that plaintiff had assaulted more than one person, and was possibly intoxicated." 56.1 ¶ 34. Plaintiff further does not dispute that the information communicated to the 911 operator was then passed along to "P.O. Moriarty and P.O. Mesaris" and that "P.O. Moriarty read th[e] information before arriving at" the shelter. 56.1 ¶ 36. When the officers arrived, Plaintiff admits that Mr. Ortiz "informed the NYPD Defendants that the altercation between Plaintiff and the other Male Resident was seen on the facility's surveillance cameras." 56.1 ¶ 40; *see also* 56.1 ¶ 46. To that end, the officers were told that Plaintiff "had acted violently towards one of the [shelter's] security officers by physically pushing the security officer when [he] asked plaintiff to check his bag for weapons." 56.1 ¶ 41. In sum, Plaintiff

does not dispute 1) that he punched another resident, 2) that the shelter thereafter called 911, 3) that the 911 operator was told he had punched multiple individuals, 4) that the officers were briefed on the assault prior to arriving at the shelter, 5) and that the officers were told again at the scene that Plaintiff had assaulted someone.

"Probable cause exists when an officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Curley v. Village of Suffern*, 268 F.3d 65, 70-71 (2d Cir. 2001) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000). Plaintiff casts no doubt on the circumstances leading up to his arrest. Before the officers arrived, they had been told that Plaintiff had assaulted multiple people. Once on the scene, Plaintiff never rebutted the shelter's staff when they reiterated this statement in front of him. *See* 56.1 ¶¶ 41, 44. And though Plaintiff now argues that Mr. Ortiz never actually saw the video of the altercation, *see* 56.1 ¶ 40, Plaintiff admits that before the officers arrested Plaintiff, Mr. Ortiz "informed the NYPD that the altercation between Plaintiff and the other Male Resident was seen on the facility's surveillance cameras." 56.1 ¶ 40. "[I]t is well established that a law enforcement official has probable cause to arrest if he received his information from some person," such as an "eyewitness," "unless the circumstances raise doubt as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) and *Singer v. Fulton County Sherrif*, 63 F.3d 110, 119 (2d Cir. 1995)).

On the undisputed facts, there can be no doubt that the officers had probable cause to arrest Plaintiff for assault. Accordingly, the Court grants Defendants' summary judgment on the

false arrest claim.[3] Defendants therefore are entitled to summary judgment on Plaintiff's false arrest claim. *See Stansbury*, 721 F.3d at 89.

## II. PLAINTIFF FAILS TO STATE A CLAIM FOR EXCESSIVE FORCE

Plaintiff brings an excessive force claim against NYPD Defendants Urena, Alba, Moriarty and Mesarias for their actions during the handcuffing at the shelter. Am. Compl. ¶ 96. Plaintiff contends that as a result of the handcuffing he suffered from "severe pain to his neck, back, and shoulder areas." Am. Compl. ¶ 96. Other than that brief description, Plaintiff does not allege how the officers used excessive force or how he was injured as a result.

The Fourth Amendment protects people from the use of excessive force by police during an arrest. *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The test for excessive force during an arrest "is one of 'objective reasonableness.'" *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (collecting cases). "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (quoting *Graham*, 490 U.S. at 397). "[A] *de minimis* use of force will rarely suffice to state a Constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992)). As the Supreme Court has acknowledged, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted).

---

[3] Because Plaintiff's false arrest claim fails, the Court does not reach the question of whether Defendants are entitled to qualified immunity.

As the Second Circuit has explained, a district court does not err in dismissal where there is "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony" and despite drawing all reasonable inferences in plaintiff's favor, "no reasonable person could believe [plaintiff's] testimony." *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (citation omitted). The record here is devoid of anything that would support Plaintiff's allegations.

The following facts relating to the handcuffing are undisputed. After discussing the events of the evening with Plaintiff, Defendant Urena "placed one handcuff on plaintiff's right wrist." 56.1 ¶ 75. Defendant Urena then asked if Plaintiff would resist, to which he replied "I'm not going anywhere." 56.1 ¶ 76. When the officers then tried to direct Plaintiff's arm behind his back to place the second loop of the handcuff, Plaintiff "resisted being handcuffed by clenching his arms and clasping his hands together in front of his torso." 56.1 ¶ 76. Then, the officers "leaned plaintiff's torso forward towards his knees and brought his hands behind his back and attached the second handcuff" around his left wrist. 56.1 ¶ 77. Throughout this encounter, "Plaintiff remained seated on his bed." 56.1 ¶ 78. Plaintiff was not thrown on the floor; nor did he have knees placed on him to facilitate the handcuffing. 56.1 ¶ 80-81. After the cuffs were firmly on Plaintiff, the officers "helped him stand up and walked him out of the" shelter. 56.1 ¶ 81. At Lincoln Hospital, Plaintiff refused any treatment and said to the attending doctor that "I am absolutely fine I have no complaints I don['[t want any medical attention or care." 56.1 ¶ 90. Later, even after Plaintiff returned to the shelter and had gone to another doctor, he "did not complain of any pain in his back, neck, or shoulders" and was "never diagnosed with any ailment in relation to any injury suffered as a result of being handcuffed." 56.1 ¶¶ 98-99.

Drawing all reasonable inferences in Plaintiff's favor, nothing in the record supports an injury to his person as a result of the handcuffing. Thus, the Court grants summary judgment in favor of Defendants on Plaintiff's excessive force claim. *Jeffreys*, 426 F.3d at 555.

## III. PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATION OF THE RIGHT TO FAMILIAL ASSOCIATION

Plaintiff asserts that his constitutional right to familial association was violated when he could not access his cell phone while handcuffed in transport to Lincoln Hospital. Am. Compl. ¶¶ 91, 93. To the extent that the right could apply to texts or phone calls while in police custody—a proposition Plaintiff does not support, an actionable claim requires "that the state action was specifically intended to interfere with the family relationship." *Gorman v. Rensselaer Cty.*, 910 F.3d 40, 48 (2d Cir. 2018). Plaintiff does not address this claim in his opposition and appears to abandon it. The exceedingly limited facts alleged in the Second Amended Complaint that a Defendant "deni[ed]" his "request to use his cell phone" do not speak to how that denial was "specifically intended to interfere with [Plaintiff's] family relationship." *Gorman*, 910 F.3d at 48. In fact, Plaintiff admits he *was* able to call his sister after he met with a doctor and left the hospital. 56.1 ¶ 93. Plaintiff's claim that Defendants violated his right to familial associations therefore fails as a matter of law. Defendant's motion for summary judgment on that claim is accordingly granted.

## IV. PLAINTIFF FAILS TO STATE A CLAIM FOR A VIOLATION OF THE COMMON LAW RIGHT TO REFUSE MEDICAL TREATMENT

For the first time in his opposition, Plaintiff alleges that he was denied a "long recognized" right to refuse medical treatment when he was taken to Lincoln Hospital. Pl. Opp. at 10-11. While there does exist a right cognizable under the Constitution to refuse medical treatment, *see Pabon v. Wright*, 459 F.3d 241, 251 (2d Cir. 2006), Plaintiff does not explain how this right was violated by any of the Defendants' actions. Indeed, when he was assessed at the

hospital, Plaintiff refused medical treatment. 56.1 ¶ 90. Plaintiff then left the hospital, without treatment. 56.1 ¶¶ 91-92. Construing the facts liberally and in Plaintiff's favor, the Court can find no violation of a right to refuse medical treatment. Accordingly, the Court grants Defendant's motion for summary judgment on that claim.

## V. PLAINTIFF FAILS TO STATE A CLAIM FOR FAILURE TO INTERVENE

Plaintiff alleges that Defendant Urena is liable under Section 1983 for failure to prevent his allegedly unlawful detention or seizure. *See* Pl. Opp. at 21. It is well established that absent an underlying constitutional violation, there can be no failure to intervene violation. *See Wieder v. City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) (Summary Order) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim."). Having determined that no constitutional violation with respect to Plaintiff's detention exists in this case, the Court grants summary judgment in Defendants' favor on Plaintiff's failure to intervene claim.

## VI. PLAINTIFF'S MONELL CLAIMS FAIL

Plaintiff contends that the City condoned a policy that allowed the Individual Defendants to use excessive force, Am. Compl. ¶ 99, and failed to supervise the Individual Defendants. Am. Compl. ¶ 55.

Under the Supreme Court's decision in *Monell v. Department of Social Service*, local governments and individuals in their official capacity may be held liable in Section 1983 actions when it can be shown that "the denial of a constitutional right [] was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of*

*New York*, 459 F.3d 207, 219 (2d Cir. 2006); *Askins v. Doe*, 727 F.3d 248, 253 (2d Cir. 2013). Because, as discussed above, there exists no constitutional violation, Plaintiff's *Monell* claims fail as a matter of law. Accordingly, the Court grants summary judgment in Defendants' favor.

## VII. THE COURT CANNOT ENTERTAIN PLAINTIFF'S STATE-LEVEL CLAIMS

Defendants argue that this Court should dismiss any remaining state-level claims for failure to comply with conditions precedent for bringing a claim against New York or its employees "founded upon tort." Defs. Mem. at 24 (citing New York General Municipal Law ("GML") §§ 50-e(1)(a), 50-h(1)). "It is well settled that federal courts entertaining state law claims against municipalities are obligated to apply any applicable state law notice-of-claim provisions." *Johnson v. City of New York*, 2019 U.S. Dist. LEXIS 10867, at *34 (S.D.N.Y. Jan. 23, 2019). "Under New York law, a plaintiff must file a notice of claim before suing municipal defendants in a personal injury action." Rentas v. Ruffin, 816 F.3d 214, 226-27 (2d Cir. 2016). Thereafter, the City may demand an examination hearing to assess the claim before beginning litigation. *See* GML § 50-h. Defendants contend that Plaintiff never appeared at his examination hearing. Defs. Mem. at 24. Plaintiff rejoins that the two notices for the hearing were sent to addresses at which he no longer lived. 56.1 ¶ 13.

The letter of the New York General Municipal Law provides that the City is entitled to an examination hearing, which Plaintiff must attend. GML § 50-h. Notice of claim requirements are construed strictly by New York state courts and "[f]ailure to comply with [them] ordinarily requires dismissal." *Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (citing *Murray LeRoy Cent. Sch. Dist.*, 67 N.Y.2d 775, 775, 500 N.Y.S.2d 643, 643, 491 N.E.2d 1100, 1100 (1986)). "This holds even where the proffered reason is that plaintiff never received the notice, though the City has mailed the demand." *Duncan v. City of New York*, 2018 U.S. Dist. LEXIS 117126, at *10 (E.D.N.Y. June 19, 2018). Construing the facts in the light

most favorable to Plaintiff, it is clear that he did not attend a required examination hearing on his state-level claims. Thus, the Court concludes it must grant Defendants' summary judgment request that Plaintiff's state-level claims be deemed barred at this juncture.[4]

## CONCLUSION

For the reasons stated herein, the Court GRANTS Defendants' Motion for Summary Judgment. The Clerk of the Court respectfully is requested to terminate the motion at ECF No. 71 and close the case.

**SO ORDERED.**

**Date: September 29, 2021**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**

[4] A district court also has discretion to "decline to exercise supplemental jurisdiction" after "dismiss[ing] all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). In general, "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The Court "balances the traditional values of judicial economy, convenience, fairness, and comity." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (internal quotation marks omitted). All factors here weigh in favor of declining to exercise supplemental jurisdiction over Plaintiff's state law-claims, even if Plaintiff had complied with the notice-of-claim provisions.